UNITED STATES of America,
Appellant,

v.

Lillian WEBB, Appellee.

No. 1002, Docket 79–1491.

United States Court of Appeals,
Second Circuit.

Argued April 8, 1980.

Decided April 28, 1980.

Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., and Mark A. Summers, Asst. U. S. Atty., Brooklyn, N. Y., on the brief), for appellant.

Gerald B. Lefcourt, New York City (Richard W. Levitt and Randye Retkin, New York City, on the brief), for appellee.

Before FRIENDLY, FEINBERG and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

The United States appeals from a pretrial order entered in the Eastern District of New York, Mark A. Costantino, *District Judge*, which suppressed and excluded on relevancy grounds, Fed.R.Evid. 401 and 402, three packets containing 99 grams of heroin confiscated by the government in connection with the warrantless arrest of appellee. The order is reversed and the case is remanded for further proceedings.

I.

Once again, we are called upon to consider the legality of the seizure of a deplaning airline passenger by agents of the federal Drug Enforcement Administration (DEA). Unlike so many of the recent cases which have come before us, however, the

instant case does *not* involve the constitutionality of an "investigatory stop" of passengers by DEA agents engaged in the surveillance of domestic flights arriving from so-called drug "source cities". *E. g., United States v. Buenaventura-Ariza*, 615 F.2d 29 (2 Cir. 1980); *United States v. Vasquez*, 612 F.2d 1338 (2 Cir. 1979); *United States v. Vasquez-Santiago*, 602 F.2d 1069 (2 Cir. 1979); *United States v. Price*, 599 F.2d 494 (2 Cir. 1979); *United States v. Rico*, 594 F.2d 320 (2 Cir. 1979); *United States v. Oates*, 560 F.2d 45 (2 Cir. 1977). Furthermore, while this case does involve the search and seizure of a passenger arriving in New York from abroad, it does not involve the constitutionality of any aspect of the "border inspections" which are conducted at international points of entry to this country. *E. g., United States v. Asbury*, 586 F.2d 973 (2 Cir. 1978). While the stage for the instant drama—like so many preceding cases—is again a New York airport, and the actors are again federal agents and deplaning passengers, the central issue in this case differs from the central issues in our previous airport stop cases. The legal issue before us today is simply whether the arrest of a suspected narcotics violator was based on probable cause.

## II.

The relevant facts are not in dispute. Sometime between 8:00 and 8:30 p. m. on the evening of June 5, 1979, Lillian Webb, an Australian citizen, arrived at JFK Airport on a flight from Paris. Webb entered the customs area of the International Arrivals Building at the airport, retrieved her luggage with the aid of a red cap, and then attempted to leave the customs area without undergoing the mandatory customs inspection. When she reached the exit and presented her unstamped declaration to the customs aide at the door, however, Webb was told that she could not leave without submitting to routine inspection. The customs aide, Patricia Lockiby, instructed Webb to return to the customs examination belt for inspection.

Webb did not comply with Lockiby's directions. Instead of returning to the examination belt, she proceeded directly to the women's restroom. The red cap, who was still carrying Webb's luggage, complained to Lockiby that Webb had gone to the restroom rather than to the examination belt. Lockiby, who had observed Webb's actions herself, followed Webb into the restroom only moments after Webb had entered. When Lockiby entered the restroom, she saw Webb standing directly in front of the sanitary napkin dispenser, which was attached to the restroom wall. Webb had placed her handbag under the dispenser and was facing the dispenser when Lockiby entered.[1] Webb, who immediately turned to face Lockiby, appeared "startled" by Lockiby's entrance. Lockiby directed Webb to go to the examination belt for inspection. Webb picked up her handbag and left the restroom. Lockiby, who had seen something protruding from the sanitary napkin dispenser, walked over to examine it. She found two pink condoms, tightly wrapped and filled with an unknown substance.

Lockiby notified her supervisor of her discovery. The supervisor contacted the DEA office at the airport. DEA Agent Michael Priore was sent to the scene. Lockiby described the recent sequence of events to Agent Priore and showed him the two condoms she had found. Agent Priore recognized the condoms as similar to the kind used to carry narcotics in body cavities.

Agent Priore then identified himself to Webb, who was now at the customs examination belt with Customs Inspector John Lundt, and proceeded to question her. Priore noted that Webb appeared nervous, thin, and unhealthy. He later stated that she looked to him like a drug addict. When Priore informed Webb that she had been observed in the area where narcotics were found, Webb immediately turned around to

---

1. There were two other persons, an elderly woman and a small child, in the restroom at the time. Both were near the restroom sinks, approximately ten feet from Webb and the sanitary napkin dispenser.

look toward the women's restroom. Webb told Agent Priore that she had just arrived from Bangkok and knew nothing about narcotics. Agent Priore, however, knew from examining Webb's declaration and passport that she in fact had arrived on a flight from Paris.

At this point, Customs Inspector Lundt requested that Agent Priore continue the questioning in a secondary customs examination room. After moving to the new room, Priore asked Webb for her airline ticket. Webb stated that she had left it on the plane.[2] When Agent Priore began examining Webb's passport, which was a duplicate newly issued in Paris, Webb explained that her old passport "had been blown from her hands by a gust of wind and landed in a puddle."

During the time that Agent Priore was engaged in questioning Webb, Customs Inspector Lundt was conducting a further inspection of Webb's luggage. He discovered a small, green scale calibrated in grams and carats. Agent Priore recognized the scale as a type commonly used for weighing narcotics. Webb said that she used the scale only to weigh beads and jewelry during her travels.[3] Agent Priore then left the examination room to consult with his supervisor on the phone. Webb remained in the room with Customs Inspector Lundt. When Agent Priore returned, he informed Webb that a fingerprint analysis would be performed on the condoms discovered in the restroom. Lundt informed Priore that a fingerprint analysis would be useless, because Webb had touched the condoms and the scale while Priore was out of the room. Webb explained that she had touched the condoms "out of curiosity". Agent Priore, however, regarded the act as "a calculated move to destroy the evidentiary value of any fingerprints" on the condoms.

At this point, Agent Priore conducted a field test on the contents of the condoms. The test showed that the condoms contained heroin. After telephoning an Assistant United States Attorney for advice, Agent Priore placed Webb under arrest.[4]

Immediately after the arrest, a strip search of Webb was conducted by two female customs agents. The search revealed nothing. Webb was questioned further at DEA offices in the airport. At one point she asked to be allowed to contact a lawyer and to make a telephone call. She was told that she could make the calls after she was transported to the Metropolitan Correctional Center, where she would be held pending arraignment. Two DEA agents then transported Webb to the MCC. While waiting to enter an interior area at the MCC, Webb picked up a tissue from a nearby table.[5] She then dropped some coins on the floor, bent down to pick them up, and simultaneously discarded the tissue in a trash can. One of the MCC guards informed the DEA agents that she had seen Webb reach under her garments when Webb had stooped to pick up the coins and discard the tissue. The trash can was then searched. The only object in the trash can was the tissue. Inside the tissue, however, was another pink condom similar to the two discovered in the airport restroom. A field test on the contents of this third condom also proved positive for heroin. A DEA agent asked Webb if "there were any more" condom packages. Webb replied, "[N]o, there were only three."

A two count indictment was returned against Webb, charging her with illegally importing and possessing with intent to distribute heroin in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 841(a)(1) (1976). Arguing that her arrest was not based on probable cause, Webb moved to suppress

---

**2.** Agent Priore at this time informed Webb that she was suspected of narcotics violations. He advised her of her *Miranda* rights.

**3.** Although it is not relevant to our analysis of whether Agent Priore had probable cause to arrest Webb, we do note for the sake of completeness that subsequent laboratory tests revealed traces of both heroin and cocaine on the scale.

**4.** Agent Priore also re-advised Webb of her *Miranda* rights.

**5.** Due to a sore on her wrist, Webb was not handcuffed.

the evidence obtained pursuant to the arrest, including the three packets of heroin and her statement at the MCC. After a hearing on the suppression motion, the district court held that Agent Priore did not have probable cause to arrest Webb. The court ordered that the third packet of heroin—the one discarded at the MCC—and the statement made by Webb at the MCC be suppressed as "tainted" by the illegal arrest.[6] The court then concluded that, without the third packet or Webb's statement, nothing remained to link Webb to the two heroin packets discovered in the airport restroom. The court therefore held that these other two heroin packets were inadmissible on grounds of relevancy. Fed.R. Evid. 401 and 402. From this pretrial order, the government appeals.[7]

### III.

As stated above, the issue before us is simply whether Agent Priore had probable cause to arrest Webb. The reasonableness of the detention and questioning of Webb prior to her arrest is not contested; neither is the propriety of the search of Webb's luggage during this questioning or the strip search of Webb after the arrest. We are concerned only with whether there was probable cause for the arrest itself.

It would serve no useful purpose to recount at length the voluminous case law and secondary literature which have sought to flesh out the skeletal term "probable cause". Certain core concepts, however, are worth re-emphasizing. " 'The substance of all definitions' of probable cause 'is a reasonable ground for belief of guilt.' " *Brinegar v. United States*, 338 U.S. 160, 175 (1949); *Carroll v. United States*, 267 U.S. 132, 161 (1925). As Chief Justice Marshall, speaking for the Court in *Locke v. United States*, 11 U.S. (7 Cranch) 337 (1813), succinctly stated, probable cause "imports a

seizure made under circumstances which warrant suspicion." *Id.* at 347. A century and a half later the Court was more expansive:

"Whether [an] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it— whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."

*Beck v. Ohio*, 379 U.S. 89, 91 (1964); *accord, Henry v. United States*, 361 U.S. 98, 102 (1959); *Brinegar v. United States*, *supra*, 338 U.S. at 175–76.

The essence of probable cause is a reasonable, objective basis for *belief* in a suspect's guilt, although not necessarily *proof* of guilt beyond a reasonable doubt. While the rule prohibiting law enforcement officers from making arrests without probable cause serves to protect the public from harassment or arbitrary police actions, the rule also must serve the concomitant interest of allowing the police to enforce the law without undue restraints. *Brinegar v. United States*, *supra*, 338 U.S. at 176; *Raffone v. Adams*, 468 F.2d 860, 864 (2 Cir. 1972). As such, probable cause to arrest is not limited to those instances where the arresting officer has acquired evidence which would be sufficient to convict the suspect at trial. *Wong Sun v. United States*, 371 U.S. 471, 479 (1963); *Draper v. United States*, 358 U.S. 307, 311–12 (1959). Similarly, facts ostensibly sufficient to establish probable cause for an arrest are not negated simply because such facts also may be consistent with the suspect's innocence. *United States v. Rodriguez*, 532 F.2d 834, 838 (2 Cir. 1976); *see Holland v. United States*, 348 U.S. 121, 139–40 (1954).

**6.** The district court alternatively ordered Webb's statement suppressed on the ground that it was taken in violation of Webb's *Miranda* rights. The court ruled that all custodial questioning of Webb should have ceased after Webb had indicated her desire to speak with an attorney. The government does *not* appeal the district's court suppression of Webb's statement.

**7.** The government appeals from the order only insofar as it suppressed and excluded the three packets of heroin. *See* note 6, *supra*.

In short, while the rule of probable cause does impose a requirement on police to act with more than mere suspicion of wrongdoing, the rule also gives police a permit to act with less than absolute certainty of guilt. "In dealing with probable cause . . . we deal with probabilities." *Brinegar v. United States, supra,* 338 U.S. at 175.

The arrest of Webb, therefore, cannot be held unconstitutional upon a mere showing that Agent Priore acted with less than proof sufficient to convict Webb at trial; nor can the arrest be held unconstitutional simply because Webb proffered innocent explanations for most of her actions at the airport. Rather, in order to ascertain whether Webb was properly arrested, we must determine whether Agent Priore had sufficient evidence to cause a reasonable and prudent man to believe Webb had brought drugs illegally into the country.

In making this determination, it is significant that prior to the arrest government agents *knew* that federal narcotics laws had been violated. They had discovered illegal drugs. Once the packets of heroin were found in the airport restroom, the question the government agents had to decide was *not* whether Webb's actions, viewed in the abstract, gave them a justifiable belief that she was a drug courier.[8] The question, rather, was whether there was sufficient evidence to cause a reasonable person to conclude that Webb had deposited these packets of heroin in the restroom. We hold that there was sufficient evidence.

■ The evidence adduced at the suppression hearing showed that Webb first tried to leave the terminal customs area without submitting to mandatory customs inspection. After failing in her attempt and being directed to go to a customs examination belt, Webb instead went to the women's restroom. Moments after entering the restroom, Webb was seen standing in front of a restroom dispenser, having placed her purse on the floor so that her hands were free. The only other persons in the restroom were nowhere near this dispenser. Startled by the customs aide who followed her into the restroom, Webb picked up her purse and left as instructed—without ever having used the toilet facilities. The customs aide then found two packets of heroin in the dispenser which Webb had just left.[9]

Contrary to the district court's ruling, this sequence of events provides cogent, objective evidence linking Webb to the drugs found by the customs aide. Subsequent actions by Webb further strengthened the link between her and the heroin. When told only that she was observed in "an area" where narcotics were found, Webb immediately turned around to look toward the restroom. A small scale, calibrated in grams and similar in type to scales used to weigh narcotics, was found in Webb's luggage. Finally, while being held for questioning, Webb deliberately handled the heroin packets, thus eliminating the evidentiary value of fingerprints on the packets. When asked why she had touched the evidence, Webb's only response was that she had done so out of curiosity.

Viewing the evidence as a whole, we hold that these facts were sufficient to "warrant a prudent man in believing" that Webb was involved in illegal drug trafficking.[10]

---

**8.** The discovery of contraband prior to the questioning or seizure of Webb further distinguishes this case conceptually from prior cases in this Court where the validity of DEA seizures of deplaning passengers was called into question. In most airport "investigatory stop" cases, for example, a DEA agent systematically observes deplaning passengers from selected flights in an effort to detect suspicious actions which indicate to him that the passengers are involved in narcotics trafficking. Only after the suspect is "seized", however, can the agent hope to acquire evidence which demonstrates that drugs *in fact* are being transported.

**9.** By inexplicably failing to call Lockiby at the hearing which she attended—Lockiby having witnessed Webb's most incriminating behavior—the government left something to be desired in its efforts to point up the significance of the restroom sequence to the district court.

**10.** Webb urges us to reject the government's claim that certain actions by her, which were not inherently suspicious, combined to give Agent Priore probable cause to arrest her. For example, Webb contends that probable cause cannot be based on Agent Priore's knowledge that Webb (1) originally said that she had ar-

Webb's actions leading up to her arrest strongly support the inference that she had imported heroin into this country and, after failing in her attempt to sneak the drugs through customs, had secreted them in the airport restroom. The discovery of the scale in her luggage and her ill-explained handling of the evidence lend further credence to this interpretation of events.

Therefore, regardless of whether Webb's actions also could be viewed as consistent with her innocence, and regardless of whether the evidence available to Agent Priore would have been sufficient to sustain an actual conviction of Webb for narcotics violations, the fact remains that DEA Agent Priore did have probable cause to arrest Webb. The evidence known to Agent Priore at the time of the arrest amply supported a reasonable, objective belief that Webb was guilty of drug trafficking. Indeed, based on the facts known to him at the time, a decision by Priore not to arrest Webb would have been an abdication of his duty to enforce the law.[11]

### IV.

In view of our holding that the arrest of Webb at JFK Airport was based on probable cause, there can be no question that the third packet of heroin discarded by Webb at the MCC is admissible. Since the arrest of Webb was proper, the seizure of this heroin-filled condom obviously could not have been "tainted" by Webb's arrest. Furthermore, we can discern no remaining basis for the district court's ruling, if ever there had been one, that the two heroin packets discovered in the airport restroom are inadmissible on relevancy grounds. The similarity of the third packet of heroin to the other two, combined with Webb's actions leading up to the discovery of the first two packets at the airport, sufficiently link Webb to the first two heroin-filled condoms to satisfy the test of relevancy under Fed.R.Evid. 401 and 402.

We therefore reverse the pretrial order of the district court suppressing and excluding the three packets of heroin seized by DEA agents in connection with Webb's arrest. The case is remanded to the district court for further proceedings consistent with this opinion.

Reversed and remanded.

rived from Bangkok, a "source city"; (2) discarded her plane ticket after her flight had landed; (3) was carrying a newly-issued duplicate passport; and (4) appeared "nervous" and "looked" like an addict to Priore.

This contention need not long detain us. To begin with, we hold that Agent Priore had probable cause to arrest Webb *without* taking the above factors into account. Therefore, assuming arguendo that these factors cannot be viewed as objectively suspicious, our disposition of the instant case would be no different. Furthermore, circumstances which are not suspicious when viewed singly or out of context may well take on added significance when considered as part of the total picture confronting an arresting officer. *See Adams v. Williams*, 407 U.S. 143, 148–49 (1972). Here, illicit drugs had been found, and a single passenger—by her attempts to circumvent the customs inspection procedures and her activity in close proxi-

mity to the spot where the drugs were found—had isolated herself as the most likely courier of the drugs. It is in this context—not in the more common context of DEA agents conducting surveillance of deplaning passengers without *any* prior evidence of a crime—that Webb's actions must be assessed. *See* note 8, *supra*. Once the physical evidence of the crime had been found by the government agents under the circumstances of this case, otherwise nonsuspicious actions of Webb objectively could be viewed in an entirely different light.

11. Agent Priore's personal views, noted by the district court, as to whether probable cause existed at various stages of his investigation at JFK Airport have little relevance to our determination of whether probable cause in fact did exist. The standard is an objective, not a subjective, one. *United States v. Oates, supra,* 560 F.2d at 58.