**UNITED STATES of America,**

v.

**Paula TERRY, Marshall Anthony Johnson, Anthony Jones, and James Smith, Defendants.**

**No. 89 Cr. 0176 (RWS).**

United States District Court, S.D. New York.

Aug. 2, 1989.

---

Benito Romano, U.S. Atty., S.D.N.Y., New York City (David Lewis, Asst. U.S. Atty., of counsel), for U.S.

The Legal Aid Soc., Federal Defender Services Unit, New York City (Robert M. Baum, of counsel), for defendant Paula Terry.

## OPINION

SWEET, District Judge.

Defendants Paula Dean Terry ("Terry"), Marshall Anthony Johnson ("Johnson"), Anthony Jones ("Jones") and James Smith ("Smith"), move pursuant to Rule 41, Fed. R.Crim.P., to suppress the physical evidence seized and statements Terry made at the time of her arrest on February 22, 1989. For the reasons set forth below, the suppression motion is denied.

### Prior Proceedings

The defendants have been arraigned on March 8, 1989 on a two-count indictment charging conspiracy to distribute a schedule I narcotic drug-controlled substance [21 U.S.C. § 812, 841(a)(1) and 841(b)(1)(C)], and possession with the intent to distribute a schedule I narcotic drug-controlled substance [21 U.S.C. § 812, 841(a)(1) and 841(b)(1)(C); 18 U.S.C. § 2] and entered pleas of not guilty. Defendants filed the instant motion on March 31, 1989. A hearing consisting of the testimony of New York State Police Investigator Thomas Moore ("Moore") and New York City Detective Hector Vega ("Vega"), present at the arrest, was held on May 15, 16, and 18, 1989. Oral argument and briefs were submitted on June 30, 1989.

### The Facts

During January and February of 1989, Moore supervised the New York Drug Enforcement Task Force surveillance of a particular individual suspected of narcotics activity at 751 Walton Avenue, a multi-unit residential apartment building in the Bronx. Investigator Moore personally participated in such surveillance on at least 15 separate occasions, and observed the suspected narcotics dealer, making afternoon trips to 751 Walton Avenue. In addition, the officers observed particular individuals stationed on the same street corners outside of 751 Walton Avenue on each occasion of surveillance. They witnessed pedestrians approach these individuals, apparently negotiate with them and then exchange money for objects.

Neither Investigator Moore nor his partner, New York State Police Investigator Martin Camhi ("Camhi"), had ever entered 751 Walton Avenue before February 22, 1989. Prior to that date, the only drug activity occurring inside the building about which he had personal knowledge was the attempted sale of narcotics to an undercover police officer several days earlier. Moore had noted at various times during

the two month period, cars with out-of-state license plates double parked in front of 751 Walton Avenue, the occupants entered the building, remained inside a few minutes, then drove away. No arrests were made or narcotics recovered.

The officers concluded from these observations that 751 Walton Avenue was a site of extensive narcotics trafficking. Subsequently, one officer was dispatched to the interior of 751 Walton Avenue in an attempt to locate the apartment that was the base of the suspected narcotics operation. The officer, although he did not locate the apartment, was approached in an interior hallway of the building and offered narcotics for sale.

On February 22, 1989 Investigator Moore determined to stop and question motorists who were apparently engaged in drug-related activity. Specifically, the officers were instructed to stop cars that double parked in front of the building if the occupants entered and remained inside 751 Walton Avenue for approximately ten minutes, then departed the area. Moore instructed Vega and New York State Police Investigator Gluchowski to stop a Jeep with New Jersey license plates as it left the vicinity of 751 Walton Avenue. Vega, who was part of the surveillance team, stopped the vehicle, questioned its driver, observed one glassine of heroin, and threw it away. No arrest was made.

At approximately 3:45 on February 22, Investigator Moore observed a Toyota Camry with Connecticut license plates double park in front of 751 Walton Avenue. He had never seen the Toyota or its occupants before. Four people exited the Toyota and walked directly from their car into the building. Moore specifically observed that none of the defendants was carrying anything. Only a few minutes later, all four defendants re-emerged from the building. Moore observed that the female defendant was carrying a brown paper bag similar to a "lunch bag" as she emerged from the building.

The four individuals re-entered the Toyota and immediately pulled away. Investigator Moore observed the Toyota turn right onto 153rd Street and began to follow the car which made a "U turn" on 153rd Street back toward Walton Avenue. Moore, driving an unmarked police car, also made a U-turn and sought to follow the car as it turned right on its return to Walton Avenue. Investigator Moore instructed Detective Vega and Investigator Gluchowski by radio to stop the white Toyota with Connecticut plates for questioning and informed them that the female had been carrying a brown paper bag. Vega and Gluchowski observed the U-turn and watched the car drive south of 153rd Street, stop, backup to 153rd Street and again make a right turn onto 153rd Street. Once back on Walton Avenue, the Toyota stopped, backed up and again turned right onto 153rd Street by then followed by Vega. The car entered the Major Deegan Expressway ("the Deegan") southbound. Vega followed the Toyota for approximately two miles after it entered and continued on the Deegan. Vega further testified that the defendants were "driving somewhat fast and [were] changing lanes." The driving of the defendants was *not* reported either in Moore's grand jury testimony or in the reports filed by the officers.

As the Toyota exited the Deegan at the Willis Avenue Exit, 138th Street, Officer Vega turned on his siren and flashing lights. As he was pulling the defendants over, and as he approached their vehicle, Vega observed an unusual amount of movement in the car.

When Detective Vega arrived at the defendants' car, the driver, Jones, rolled down his window. Vega then asked the driver, Jones, from where they were coming. Jones responded that they had been shopping. At that point, Vega ordered the defendants out of the car. His gun was not drawn. He then patted down Johnson, Jones and Smith. He did not frisk Terry, "but started to open her jacket." After opening Terry's jacket he observed a bulge and removed a brown paper bag from under Terry's sweatshirt. Gluchowski was observing the scene at a distance with his hand in his pocket.

After Vega opened the jacket and observed the bag, Johnson fled. Investigators Gluchowski and Moore and Police Officer Camhi pursued Johnson and caught him.

Terry and the other defendants were placed under arrest. Following her arrest, Terry and the other defendants made inculpatory post arrest statements. The police recovered 289 glassines of heroin from the paper bag.

Although Detective Vega testified that he smelled marijuana when he approached the white Toyota and saw evidence of marijuana use, the DEA–6 Report prepared by Moore does not reflect those facts. Detective Vega also testified that upon opening Terry's jacket he observed the brown paper bag and saw the glassine envelopes within it. The DEA–6 Report and Moore's grand jury testimony submitted in support of his application for a warrant to search the apartment at 751 Walton Avenue stated that the brown paper bag was found under Terry's sweatshirt. Despite the hearsay nature of the report, testimony and affidavit, as opposed to the direct testimony of Detective Vega, the documentary evidence is preponderant as to location of the heroin. The DEA–6 Report is silent as to driving pattern and the marijuana, but two officers confirmed the driving pattern. Because the DEA–6 is an internal report, the officers have sufficient time to review the report to ensure its accuracy, and the purposes of such a report are enhanced when, as here, it is relied upon to contain the accurate version of the facts. *Cf. United States v. Oates,* 560 F.2d 45, 84 (2d Cir. 1977).[1]

*The Investigatory Stop*

■ A policeman may stop an individual for questioning if they have a reasonable suspicion of criminal activity based on specific, objective and articulable facts. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). *United States v. Gaviria,* 740 F.2d 174, 181 (2d Cir.1984); *United States v. Forero–Rincon,* 626 F.2d 218, 221 (2d Cir.1980). Although a mere suspicion or subjective hunch does not justify an investigatory stop even when the arresting officer has special training, *United States v. Buenaventura–Ariza,* 615 F.2d 29, 37 (2d Cir.1980), the circumstances under which a reasonable suspicion is determined must be viewed from the perspective of a reasonable and cautious police officer on the scene, guided by his experience and training. *United States v. Magda,* 547 F.2d 756, 758 (2d Cir.1976), *cert. denied,* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977) quoting *United States v. Hall,* 525 F.2d 857, 859 (D.C.Cir.1976). Such a stop may be upheld even though there is no probable cause to make an arrest. *Terry,* 392 U.S. at 22, 88 S.Ct. at 1880; *Magda,* 547 F.2d at 758. Courts have long held that these limits of the Fourth Amendment apply equally to investigatory stops of cars. *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Magda,* 547 F.2d at 756.

The Second Circuit has thoroughly examined these principles and applied them to investigative stops in similar narcotics cases. *United States v. Vasquez,* 638 F.2d 507, 523 (2d Cir.1980), *cert. denied,* 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981).

■ Here as in *Vasquez, supra,* a reasonable articulable suspicion of narcotics activity existed where a person enters a building known to be a location where drug sales are conducted empty-handed, and leaves after a short period of time carrying

---

1. The *Oates* court concluded that "in criminal cases reports of public agencies setting forth matters observed by police officers and other law enforcement personnel and reports of public agencies setting forth factual findings resulting from investigations made pursuant to authority granted by law cannot satisfy the hearsay exception if those reports are sought to be introduced against the accused." *Oates,* 560 F.2d at 84. The public policy reasons for the business records exception to the hearsay rule, Fed.R.Evid. 803(6)(7), are applicable in making determinations of reliability and credibility here, where defendants use the facts alleged in the DEA 6 Report to attack the credibility of the police officer's testimony.

a bag. *Vasquez,* 638 F.2d at 507. A person's erratic and evasive driving away from a building under police surveillance for drug activity also creates a reasonable suspicion when it is viewed by experienced officers as part of a behavior pattern seen many times before. *United States v. Vasquez,* 634 F.2d 41, 43 (2d Cir.1980); *United States v. Ginsberg,* 758 F.2d 823, 828 (2d Cir.1985); *United States v. Martinez–Gonzalez,* 686 F.2d 93, 99 (2d Cir.1982).

■ Thus defendants' actions, taken as a whole, provided the officers with reasonable suspicion to believe that the defendants were engaged in criminal activity and thus justified the investigatory stop of the Toyota. *See United States v. Oates,* 560 F.2d 45, 61 (2d Cir.1977). Further, Officer Vega lawfully ordered the defendants out of the car under the circumstances of a lawful investigatory stop. *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977).

*The Officers had Reason to Frisk*

■ Subsequently, Officer Vega conducted a valid frisk of Jones and Smith and had legal grounds to conduct a frisk of Terry. An officer may conduct a limited protective search for weapons, a *"Terry"* search, where during a justified investigatory stop he reasonably believes that the individual he is searching is armed and dangerous to the officers or to others. *Terry,* 392 U.S. at 24, 88 S.Ct. at 1881; *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Id.,* at 146, 92 S.Ct. at 1923. A police officer may base his belief that a suspect is armed and dangerous on the nature of the criminal activity despite the fact that he did not personally observe any physical indication of a weapon such as a bulge. *Terry,* 392 U.S. at 27–28, 88 S.Ct. at 1883.

"The standard of suspicion necessary to allow a frisk for weapons is not a hard one to meet, for even if "the belief that [the suspect] might be carrying a weapon rested upon fragile grounds '... courts should not set the test of suspicion that the individual is armed and presently dangerous' too high when protection of the investigating officer is at stake." *United States v. Riggs,* 474 F.2d 699, 705 (2d Cir.), *cert. denied,* 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973). Under *Terry,* a search for weapons "consists solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault." *Sibron v. New York,* 392 U.S. 40, 65, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968). Where such a patdown of the outer clothing reveals a hard bulge, the police may then reach inside the clothing to determine whether that bulge is a weapon. *Terry,* 392 U.S. at 29, 88 S.Ct. at 1884.

The Second Circuit has recognized that "to substantial dealers in narcotics," firearms are 'tools of the trade'" and often grounds for a *Terry* frisk. *Oates,* 560 F.2d at 62.[2] Moreover, officers must be given leeway in a narcotics crime to conduct a protective frisk due to the violent nature of the narcotics crime. *See Oates,* 560 F.2d at 61; *United States v. Del Toro,* 464 F.2d 520, 521 (2d Cir.1972). Thus Officer Vega was justified in frisking the defendants because of the circumstances and nature of the crime.

*There was Sufficient Probable Cause to Support An Arrest*

The defendants allege that the search of Terry was more than a pat down of her outer clothing and therefore went beyond the bounds of a legitimate *Terry* frisk. However, the issue of whether Vega's search of Terry was a valid *Terry* search or an arrest need not be determined because the search was supported by probable cause.

■ The Second Circuit has stated that "a maximal intrusion, even if just short of

---

**2.** The Court in *United States v. Ceballos,* 654 F.2d 181 at 184 (2d Cir.1981) held that such logic on its own was not sufficient to provide

probable cause to support a maximal intrusion equivalent to an arrest. However, it is sufficient to satisfy the reasonableness test of *Terry.*

arrest, must be based upon probable cause." *United States v. Vasquez,* 612 F.2d 1338, 1341 (1979); *United States v. Price,* 599 F.2d 494 at 499 (2d Cir.1979). A detention which is too intrusive to be justifiable upon the basis of reasonable suspicion can be justified under the probable cause standard in order to be reasonable within the Fourth Amendment. *Vasquez,* 612 F.2d at 1341; *see Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). Thus a search which is more intrusive than a *Terry* search is tantamount to a warrantless arrest and must be based upon probable cause. *See United States v. Ceballos,* 654 F.2d 177, 182 (2d Cir.1981); *United States v. Watson,* 423 U.S. 411, 423–24, 96 S.Ct. 820, 827–28, 46 L.Ed.2d 598 (1976). In the event the search went beyond a *Terry* stop, the point at which Officer Vega put his hand inside Terry's sweatshirt would constitute a seizure and therefore the arrest of Terry. However, as will be set forth below, that arrest was supported by probable cause as distinguished from the situation in *Ceballos,* 654 F.2d at 184.

### Probable Cause

Probable cause exists where "the facts and circumstances within [the officers] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. *Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979); *United States v. Webb,* 623 F.2d 758, 761 (2d Cir.1980). A defendant's false statement may provide reasonable suspicion that he was engaged in criminal activity. *United States v. Herbst,* 641 F.2d 1161, 1166 (5th Cir.), *cert. denied,* 454 U.S. 851, 102 S.Ct. 292, 70 L.Ed.2d 141 (1981).

■ The case at hand differs in a sufficiently significant manner from *Ceballos,* 654 F.2d at 181 relied upon by Terry. In *Ceballos,* the majority held that a brief presence at a location suspected to be used for the sale of narcotics and possession of a brown paper bag by a person of the same description as the suspected purchasers did not constitute probable cause. *Id.* Here two additional elements are present, the evasive driving and Jones' false statement. For these reasons, the search and simultaneous arrest performed in this case are supported by probable cause.

The fact that Jones lied to the officers about their whereabouts immediately prior to the stop, supports the requisite finding of probable cause sufficient to place Terry under arrest even without the additional proof supplied by the heroin found on Terry. *Herbst,* 641 F.2d at 1166. The search of Terry is valid therefore as a search incident to a lawful arrest. *Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980).

### The Frisk of Terry

■ Although it is not determinative here, the search of Terry may also be considered a valid *Terry* protective search and upheld on the basis of reasonable suspicion. Such a search constitutes a valid protective search, supported by reasonable suspicion when the degree of intrusion used in the search is no greater than the circumstances require. *See, Vasquez,* 638 F.2d at 520.

The Supreme Court has held that an officer may reach into a suspect's clothing, such as his belt, without a preliminary frisk, if he has specific information that a weapon is hidden there. *Adams,* 407 U.S. at 148, 92 S.Ct. at 1924 (1972). In addition, *Terry* established that the search must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of the police officer." *Terry,* 392 U.S. at 29, 88 S.Ct. at 1884. The Second Circuit has not addressed specifically the scope of a *Terry* search beyond the terms stated in *Terry.* It has upheld searches where there was no evidence of harassment, intimidation, physical restraint, humiliation or prolonged questioning. *Magda,* 547 F.2d at 759; *Price,* 599 F.2d at 503 (1979). The Ninth Circuit has held that *Terry* does not limit a weapons search to a pat down of the outer clothing. *United States v. Thompson,* 597 F.2d 187 (9th

 

Cir.1979); *United States v. Hill,* 545 F.2d 1191, 1193 (9th Cir.1976). While general exploratory searches are precluded, any reasonably limited intrusion that is designed to uncover instruments of assault is allowed, including reaching into a suspect's coat pocket and lifting a suspect's shirt.[3]

Applying these holdings to the case at hand, the search of Terry does not appear to surpass a valid *Terry* search. The principle established in *Terry* was that a search is only validly within the Fourth Amendment if its scope is no broader than necessary to accomplish legitimate governmental objectives. *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883. The DEA 6 Report stated that Officer Vega found the bag underneath Terry's sweatshirt over which she wore an open leather jacket. Here, Officer Vega's opening of the jacket to reveal a bulge underneath Terry's sweatshirt satisfies the criterion of a limited intrusion. This search was not overly intrusive given the officer's need to protect himself from assault. Because Terry had on two layers of outer clothing, it would be difficult to notice bulges that were concealed beneath more than one layer.

Moreover, in patting Terry down, Vega would have had to press his hands firmly against her body to determine whether any objects that could be used as weapons were concealed beneath those two layers. Vega's testimony suggests that he was reluctant to perform such a search on Terry. Indeed, such a patdown would have been more intrusive and harassing than the search Officer Vega did perform.

*The Post Arrest Statements*

The inculpatory statements which Terry and the other defendants made after their arrests are also admissible. Because the arrest of Terry was validly based upon probable cause and Officer Vega's search was therefore valid, the post arrest statements made by the defendants are admissible. The issue of standing therefore is not reached.

*Conclusion*

For the reasons set forth below, the defendant's motion is denied. Both the physical evidence and each defendants' post arrest statements are admissible.

Trial is set for September 18, 1989.

It is so ordered.

---

3. *Thompson,* 597 F.2d at 191, (court upheld an officer's reach into a defendant's coat pocket to determine whether he was carrying a weapon as a limited intrusion and valid under the *Terry* doctrine); *Hill,* 545 F.2d at 1193, (court sustained an officer's lifting of the suspect's shirt which was hanging outside his trousers where the officer saw a bulge which he suspected was caused by a weapon. No preliminary patdown occurred).