DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

STATE OF FLORIDA,

Appellant,

v.

GUILLERMO RODRIGUEZ LOPEZ,

Appellee.

No. 2D22-1194
————————————————

January 19, 2024

Appeal from the Circuit Court for Hillsborough County; Samantha L. Ward, Judge.

Ashley Moody, Attorney General, Tallahassee, and Laurie Benoit-Knox, Assistant Attorney General, Tampa, for Appellant.

Danielle Villamil and Deborah Goins of Escobar & Associates, P.A., Tampa, for Appellee.

ROTHSTEIN-YOUAKIM, Judge.

The State appeals an order granting Guillermo Rodriguez Lopez's motion to suppress contraband seized from his house pursuant to a search warrant.[1] The trial court concluded that the affidavit underlying the warrant did not establish probable cause and concluded further that the good faith exception to the exclusionary rule was inapplicable. We reverse the court's order and remand for further proceedings. We also

---

[1] We have jurisdiction. Fla. R. App. P. 9.030(b)(1)(B); 9.140(c)(1)(B).

take this opportunity to clarify our reasoning in *Garcia v. State*, 872 So. 2d 326 (Fla. 2d DCA 2004), to the extent necessary.

**Background**

Law enforcement officers sought a warrant authorizing the search of Rodriguez Lopez's Monique Avenue house and the seizure of certain items from there. According to the affidavit supporting the application for the warrant, officers had initiated an extensive, twelve-month-long investigation after receiving two anonymous tips that Rober Ramos-Pena and others were involved in the indoor cultivation of marijuana. The affiants, Detectives Antonio Gonzalez and Tylor Lenzmeier, set forth the observations that had led officers to suspect that Ramos-Pena was cultivating marijuana at a house on Bayou Drive and that others were engaged in similar activities at various other houses.

As it relates specifically to Rodriguez Lopez, the affidavit included, in sum, the following information.

In the morning of November 28, 2016, Ramos-Pena left the house on Bayou Drive, stopped briefly at the La Serena Drive house of Ahmed Ali Kalil, a suspected marijuana distributor in the operation, and then met with Rodriguez Lopez at the house on Monique Avenue.

On February 9, 2017, Detective Sutter observed five surveillance cameras at the front of the Monique Avenue house. He also observed that one of the front bedroom windows of the house had been covered from the inside with drywall "as if was being sealed off." The affidavit stated, "It is common for indoor marijuana grow houses to seal off rooms to a residence in order to prevent the odor of marijuana or sodium vapor lights from emitting from the residence." The affidavit did not indicate Detective Sutter's first name and included no information concerning his training or experience.

2

The Monique Avenue house was in Rodriguez Lopez's name, and it had an average monthly electricity bill of $360. A photograph of the single-story block house was included with the affidavit.

In the evening of March 22, 2017, Ramos-Pena had a telephone conversation with Josue Ortega in which Ramos-Pena asked Ortega if he "wanted one or two."[2] Ortega then told Ramos-Pena to "bring two" and that they would meet at the Publix. The affidavit stated, "Based on Detective Sutter's training and work experience, it is believed they were discussing a narcotics transaction" and that "[t]he terms 'one or two' refer[] to one or two pounds of marijuana." Approximately forty minutes later, Detective Sutter observed Ramos-Pena arrive at the Monique Avenue house and meet with two Hispanic men. Ramos-Pena then left the Monique Avenue house and met with Ortega as planned. Ortega got into Ramos-Pena's car and got out approximately eight minutes later with a black bag. Ortega asked Ramos-Pena "how much he should charge the buyers," and Ramos-Pena said that he "wanted $1900 to $2000 for it." The two then discussed the quality of the marijuana.

In the early morning hours of April 27, 2017, Detective Mayes and Detective Byrne were standing in the street in front of the Monique Avenue house and "detected the odor of vegetative marijuana emitting from the residence." As they walked up the driveway toward the house, which according to the affidavit was "the common access way to [the] front door," the odor grew stronger, and as they reached the front door, the odor "became overwhelming." The odor then faded as they walked away from the house. As with Detective Sutter, the affidavit did not

_____

    [2] All of the telephone conversations referenced in the affidavit were intercepted through a previously authorized wiretap.

3

include the two detectives' first names or any information concerning their training or experience.

The supporting affidavit detailed two recorded phone conversations between Rodriguez Lopez and Ramos-Pena. In the first, which took place in the evening of March 28, 2017, Rodriguez Lopez told Ramos-Pena that "his associate had someone coming to look at the merchandise tomorrow." Ramos-Pena then advised Rodriguez Lopez that "he is going up there tomorrow to work." The affidavit stated, "Based on your Affiant's training and work experience, it is believed they were discussing a narcotics transaction." In the second conversation, which occurred on April 11, 2017, Ramos-Pena told Rodriguez Lopez that "three are $4,500 plus the $5,000 for a van equals $10,000." Ramos-Pena then referred to $4,500 as "that thing," and Rodriguez Lopez advised Ramos-Pena that Ramos-Pena had given Rodriguez Lopez "that thing" for $3,500. The affidavit stated, "Based on your Affiants' training and work experience, it is believed they were negotiating prices for marijuana and the amounts owed for marijuana sales."

After obtaining the search warrant, officers searched Rodriguez Lopez's house and seized nine live marijuana plants and materials for their growth. Rodriguez Lopez was one of nine codefendants charged with various offenses arising out of the cultivation operation.

Rodriguez Lopez moved to suppress the evidence seized from his house, arguing that the four corners of the warrant affidavit failed to establish any nexus between illegal activity and him or the house. He argued further that the affidavit had omitted material facts, such as his employment with a car dealership and past instances in which he and Ramos-Pena had engaged in vehicle transactions. Finally, he argued

4

that in light of these deficiencies, officers had no reasonable grounds to believe that the warrant had been properly issued.

The only witness at the suppression hearing was Detective Lenzmeier, one of the supporting affidavit's two affiants.[3] Lenzmeier's testimony on direct examination was brief: in sum, he testified that the facts included in the affidavit were the facts that had led him to believe that he had probable cause to obtain the warrant.

Cross-examination was devoted almost entirely to the recorded telephone conversations. Lenzmeier acknowledged that while the affidavit recounted the conversations in English, they had actually been conducted in Spanish and that in analyzing those conversations, he had relied on translations by his coaffiant, Detective Gonzalez, and "other translators involved in the process." Lenzmeier agreed with defense counsel that he should have noted in the affidavit that the conversations had been in Spanish and that he had relied on others' translations, and he conceded that he could not attest to the others' specific qualifications as Spanish-language translators. He testified that coaffiant Gonzalez had "had a primary responsibility with reviewing and translating and understanding what the Spanish phone calls were," but he also conceded that he did not know Gonzalez's specific qualifications either. He explained: "[W]hen I work with my fellow detective and we're under the investigation, we're accomplishing an objective here. You know, if he says I can speak Spanish and listens to a call and says this is what it is, you know, I take that at its word."

---

[3] This was a joint evidentiary hearing with codefendant Ali Kalil, who had filed his own suppression motion.

Ultimately, the trial court granted Rodriguez Lopez's motion and suppressed the evidence obtained from the search of his house.[4] Concluding that the supporting affidavit did not present the issuing magistrate with a substantial basis to determine that probable cause existed, the court emphasized, among other things, that the anonymous tips that had given rise to the entire investigation had not mentioned Rodriguez Lopez or the Monique Avenue house; that officers had never observed Rodriguez Lopez shopping for hydroponic equipment or engaging in drug transactions and had never observed any transactions at the Monique Avenue house; and that only a small number of the total observations and conversations included in the affidavit involved either Rodriguez Lopez or the Monique Avenue house.

The trial court also highlighted information that it determined the affiants should have included in the affidavit but did not, most notably Rodriguez Lopez's involvement in the vehicle trade. The court concluded that this information was material and that had it been included, it would have defeated probable cause because it would have cast a different and innocent light on Rodriguez Lopez's conduct and conversations. With regard to those conversations, the court noted that the affidavit failed to connect Rodriguez Lopez to a particular telephone number or otherwise explain how detectives had ascertained his participation on the calls in the first place. The court noted further the affidavit's failure to indicate that the conversations had been in Spanish and that Detective Lenzmeier had relied on translations by other detectives with unspecified qualifications.

Similarly, the trial court pointed out the lack of information concerning the qualifications of Detectives Sutter, Mayes, and Byrne to

---

[4] The court also granted Ali Kalil's suppression motion.

opine as to the significance of their observations. More fundamentally, the court concluded that as Mayes's and Byrne's investigation of the odor had led them onto Rodriguez Lopez's property and up to the front door of the Monique Avenue house, it had morphed into an illegal search. Presumably, therefore, the court excluded from the probable cause calculus their asserted detection of the odor of vegetative marijuana emanating directly from that house. *See State v. Hood*, 68 So. 3d 392, 395 (Fla. 2d DCA 2011) ("It is axiomatic that evidence resulting from an illegal search cannot be the basis of probable cause supporting a subsequent search warrant." (quoting *State v. Rabb*, 920 So. 2d 1175, 1187 (Fla. 4th DCA 2006))).[5]

Finally, the trial court concluded that the good faith exception was inapplicable because a "reasonably trained law enforcement officer would have known that the affidavit in this case failed to establish probable cause for the search" given that the affidavit "show[ed] no nexus between the object of the search . . . and the residence." For the reasons set forth below, we reverse.

## Discussion

Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Amend. IV, U.S. Const.

> Probable cause is a practical, common-sense question. It is the probability of criminal activity, and not a prima facie showing of such activity, which is the standard of probable cause. The determination of probable cause involves factual

---

[5] On appeal, the State does not challenge the trial court's conclusion that the investigation into the source of the odor was illegal. We therefore assume without deciding that the trial court was correct.

7

and practical considerations of everyday life on which
reasonable and prudent men, not legal technicians, act.

*Polk v. Williams*, 565 So. 2d 1387, 1390 (Fla. 5th DCA 1990) (internal
citations omitted).

"[A] magistrate must . . . examine the sufficiency of the probable
cause alleged in [an] affidavit under the totality of the circumstances."
*State v. Exantus*, 59 So. 3d 359, 361 (Fla. 2d DCA 2011) (citing *Illinois v.
Gates*, 462 U.S. 213, 238 (1983)). "The trial court, in turn, must
determine 'whether the issuing magistrate had a substantial basis for
concluding that probable cause existed . . . .' " *Id.* (quoting *State v.
Vanderhors*, 927 So. 2d 1011, 1013 (Fla. 2d DCA 2006)). In doing so,
"[t]he trial court should afford 'great deference' to the magistrate's
decision and should not review the magistrate's decision de novo." *Id.*
(first quoting *Gates*, 462 U.S. at 236; then quoting *Pilieci v. State*, 991 So.
2d 883, 892 (Fla. 2d DCA 2008); and then quoting *Rios v. State*, 483 So.
2d 39, 41 (Fla. 2d DCA 1986)).

Here, the affidavit provided information concerning the
investigation of the overarching cultivation scheme involving multiple
persons and multiple residences, from its inception forward. It stated
with respect to Rodriguez Lopez and the Monique Avenue house in
particular that the front window of the house was sealed off with drywall
in a manner consistent with attempting to conceal the discovery of an
indoor grow operation; that the front of the house had five security
cameras; that the single-story block house had an average electricity bill
of approximately $360 per month;[6] and that detectives had smelled the

---

[6] Although the affidavit did not include neighborhood comparators
by which the reviewing magistrate could determine whether such a bill
indicated higher than normal electricity usage, the affidavit included the
average bills for other residences believed to be involved in the marijuana

odor of vegetative marijuana while walking down the sidewalk in front of the house.

The affidavit also described two recorded telephone conversations in which Ramos-Pena and Rodriguez Lopez discussed suspected drug transactions. Further, the affidavit described two occasions on which Ramos-Pena traveled to the Monique Avenue house—the first involving a meeting between Ramos-Pena and Rodriguez Lopez right after Ramos-Pena had visited both the Bayou Drive drug house and another suspected drug house, and the second involving a meeting between Ramos-Pena and two unidentified men shortly after Ramos-Pena had arranged a marijuana transaction and immediately preceding his execution of that transaction.

We cannot agree with the trial court that *taken as a whole*, these facts fail to establish a nexus between the marijuana cultivation scheme and the Monique Avenue house. Although the court concluded that omitted information concerning Rodriguez Lopez's involvement in the vehicle trade would have negated probable cause because the conversations were equally consistent with innocent negotiations regarding vehicles, probable cause does not necessarily disappear simply because an innocent explanation may be consistent with facts that the officer views as suspicious. *United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995) ("[O]bservations of conduct consistent with drug trafficking, even though apparently innocuous, can give rise to probable cause."); *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) (explaining, "[t]he fact that an innocent explanation may be consistent with the facts

_____

cultivation scheme, and the average bill for the Monique Avenue house was more than twice as high as nearly all of those.

alleged" negates neither probable cause nor a good faith belief in probable cause (first citing *United States v. Ivic*, 700 F.2d 51, 57 (2d Cir. 1983); and then citing *United States v. Webb*, 623 F.2d 758, 761 (2d Cir. 1980))). Rather, it would have simply been one more fact for the magistrate to consider in conjunction with the other information provided.

Moreover, although the trial court took issue with the affiants' failure to lay out the experience and expertise of the other identified officers on whom they relied and to explain how they ascertained that it was actually Rodriguez Lopez's voice on those record telephone conversations, "[s]tatements by law enforcement officials based upon personal observation or upon the observation of fellow officers participating in the same investigation are entitled to a presumption of reliability." *United States v. May*, 819 F.2d 531, 536 (5th Cir. 1987). Notably, Rodriguez Lopez did not argue that he did not participate in the recorded conversations or that the translations were inaccurate, only that the conversations were equally susceptible to an innocent interpretation.

But assuming that given these deficiencies, the existence of probable cause presents a close question on which reasonable minds could differ—or even that probable cause was in fact lacking— suppression would nonetheless be unwarranted under the good faith exception to the exclusionary rule. *See United States v. Morton*, 46 F.4th 331, 338 (5th Cir. 2022) ("Judgment calls in close cases are precisely when the good-faith rule prevents suppression based on after-the-fact reassessment of a probable-cause determination." (citing *United States v. Leon*, 468 U.S. 897, 914 (1984))). This good faith exception exists where evidence has been seized in reasonable reliance on a warrant issued by a

10

neutral and detached magistrate, even if the affidavit in support of the warrant is later found to have been lacking the requisite probable cause. *See Leon*, 468 U.S. at 926 (holding that an officer's objectively reasonable reliance on an issuing magistrate's probable cause determination may preclude application of the exclusionary rule); *Barrentine v. State*, 107 So. 3d 483, 485 (Fla. 2d DCA 2013) ("Under [the good faith] exception, evidence seized in reasonable reliance on a warrant issued by a detached and neutral magistrate is generally admissible." (citing *Pilieci*, 991 So. 2d at 895)).

"The rationale behind the good faith exception is that the exclusionary rule 'is designed to deter police misconduct rather than to punish the errors of judges and magistrates.' " *State v. McGill*, 125 So. 3d 343, 352 (Fla. 5th DCA 2013) (quoting *Leon*, 468 U.S. at 916). "Therefore, when the police act in good faith on a warrant they have no reason to believe is invalid, the deterrent effect of suppressing illegally seized evidence is minimal." *Id.* (citing *Leon*, 468 U.S. at 919–20).

The good faith exception is unavailable if (1) the issuing magistrate was misled by information included in the supporting affidavit "that the affiant knew was false or would have known was false" but for the affiant's "reckless disregard of the truth," or if material information was knowingly or recklessly omitted from the affidavit; (2) the "issuing magistrate wholly abandoned" his detached and neutral role; (3) the supporting affidavit is " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable' "; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 922–23 (citations omitted); *see also Pilieci*, 991 So. 2d at 897–98 (applying the *Leon* formulation of the good faith exception and remanding for further

11

proceedings); *United States v. Xiang*, 12 F.4th 1176, 1182–83 (10th Cir. 2021) (explaining when good faith exception is unavailable based on omitted information). Here, the trial court relied on the third ground, concluding that "a reasonably trained law enforcement officer would have known that the affidavit . . . failed to establish probable cause" because it "show[ed] no nexus between the object of the search" and either Rodriguez Lopez or the Monique Avenue house.[7]

Again, we cannot agree. "To exclude evidence on this [third] ground, the affidavit must be so clearly insufficient 'that it provided "no hint" as to why police believed they would find incriminating evidence.' " *United States v. McCall*, 84 F.4th 1317, 1325 (11th Cir. 2023) (quoting *United States v. Morales*, 987 F.3d 966, 976 (11th Cir. 2021)). Notwithstanding the trial court's meticulous catalog of the affidavit's deficiencies,[8] the affidavit here is not "so lacking" in probable cause as to render official belief in its existence entirely unreasonable. *See, e.g., Morton*, 46 F.4th at 336–37 (discussing "bare bones affidavits" that preclude application of the good faith exception and exploring "just how bare" they have to be); *United States v. Hodge*, 246 F.3d 301, 309 (3d Cir. 2001) ("At a minimum, the affidavit was not clearly lacking in indicia of probable cause, but presented a close call. Once the magistrate judge

---

[7] The trial court made no findings and the record is otherwise bare of grounds that would support the application of any of the three other limitations on the good faith exception, and we therefore do not consider them here.

[8] Although we conclude that suppression was unwarranted, we do not disagree with the trial court that the affidavit could have included the additional information that the court identified and would have been the better for it.

made that call, it was objectively reasonable for the officers to rely on it.").

To the extent that Rodriguez Lopez claims that that is not the test in light of our decision in *Garcia*, 872 So. 2d at 326, he misinterprets our holding in that case. There, the affidavit recounted that the confidential informant had twice made controlled purchases of cocaine from Garcia. *Id.* at 327–28. But it did not mention Garcia's residence other than noting that Garcia had traveled from his residence to the prearranged meeting place for the second controlled purchase and had then been arrested "before he drove back" to that residence. *Id.* A search warrant nonetheless was issued for Garcia's residence. On appeal, we concluded that the affidavit "fail[ed] to establish a nexus between the object of the search, cocaine, and Garcia's residence." *Id.* at 330. Given the wholesale absence of any nexus, we held that the good faith exception was inapplicable, adding that "[w]here, as here, the supporting affidavit fails to establish probable cause to justify a search, Florida courts refuse to apply the good faith exception." *Id.* (first citing *Getreu v. State*, 578 So. 2d 412 (Fla. 2d DCA 1991); and then citing *Bonilla v. State*, 579 So. 2d 802 (Fla. 5th DCA 1991)).

It is on that last line that Rodriguez Lopez hangs his hat. And we recognize, as have some of our sister districts, that stripped of its context, that line may be misleading. *See McGill*, 125 So. 3d at 350–51 (expressing concern that this "unfortunate language" in *Garcia* may have misled the trial court "in its understanding of the good faith exception"); *Wingate v. State*, 289 So. 3d 566, 570 (Fla. 1st DCA 2020) (rejecting the defendant's reliance on "[t]his portion of *Garcia*," which "misconstrues the *Leon* rule and the few instances where it is inapplicable"). We therefore take the opportunity to reiterate that it is only in cases in which

13

the affidavit is not "merely" lacking in indicia of probable cause but " '*so* lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable' " that courts must set aside the good faith exception and apply the exclusionary rule. *Leon*, 468 U.S. at 923 (emphasis added) (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975)) (Powell, J., concurring in part). Such was the case in *Garcia* as well as in subsequent cases in which we have referred to that portion of *Garcia*. *See, e.g.*, *Smitherman v. State*, 342 So. 3d 685, 688–89 (Fla. 2d DCA 2022) (concluding that the good faith exception was inapplicable given the affidavit's wholesale failure to establish a nexus between the suspected criminal activity and the premises to be searched); *Chery v. State*, 331 So. 3d 789, 792 (Fla. 2d DCA 2021) (concluding that the good faith exception was inapplicable given that the affidavit was devoid of facts to establish that the affiant had personal knowledge of the reliability of the informant or to independently corroborate the information supplied by the informant); *Gonzalez v. State*, 38 So. 3d 226, 230 (Fla. 2d DCA 2010) (determining "that the facts as alleged in the affidavit failed to demonstrate a reasonable probability that contraband would be found in the residence" where the affidavit lacked any allegation that anyone had seen contraband inside the home or that officers had observed unusual activity at the residence). Indeed, taking that one line out of context as a self-contained and reasoned holding would, as the First District noted in *Wingate*, 289 So. 3d at 570, impermissibly "vitiate[] the holding in *Leon*, and create[] an exception that swallows the rule."

Accordingly, taken as a whole, the statements in the affidavit provided a substantial basis for the magistrate's determination that probable cause existed for the issuance of a warrant. But even if they

did not, the good faith exception to the exclusionary rule precluded suppression of the evidence seized at the Monique Avenue house. We therefore reverse the trial court's order granting suppression and remand for further proceedings.

Reversed and remanded.

CASANUEVA and MORRIS, JJ., Concur.

_____

Opinion subject to revision prior to official publication.