**UNITED STATES of America, Appellee,**

**v.**

**Jose Antonio CASADO, Defendant–Appellant.**

**Docket No. 01–1488.**

United States Court of Appeals, Second Circuit.

Argued: April 5, 2002.

Decided: Sept. 12, 2002.

Michael P. Schiano, Rochester, NY, for Defendant–Appellant.

Everardo A. Rodriguez, Assistant United States Attorney (Kathleen M. Mehltretter, United States Attorney for the Western District of New York), Rochester, NY, for Appellee.

Before KEARSE, SACK, and B.D. PARKER, Circuit Judges.

SACK, Circuit Judge.

Defendant Jose Antonio Casado pleaded guilty in the United States District Court for the Western District of New York (David G. Larimer, *Chief Judge*) to possessing cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and to disobeying a lawful court order in violation of 18 U.S.C. § 401(3). Casado conditioned his guilty plea on the possession count upon his ability to appeal from the district court's denial of his motion to suppress the fruits of a

search of his pocket by a police officer. Casado challenges the district court's conclusion that the officer's reach into his pocket and removal of its contents were justified as a protective weapons search under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[1] We agree with Casado's argument that the search was excessive in scope. We therefore vacate the judgment in part and remand the case to the district court with instructions to vacate the order denying Casado's motion to suppress and to grant the motion, and for further proceedings consistent with this opinion.

## BACKGROUND

In denying Casado's motion to suppress, the district court adopted the report and recommendation of Magistrate Judge Jonathan W. Feldman. Unless otherwise indicated, the facts presented here are as found by the magistrate judge or are not challenged by either party on appeal.

Casado was arrested by Investigator John Storer of the Ontario County (New York) Sheriff's Office. At the time of the arrest, Storer had twenty-two years of police experience, including seven in a special narcotics unit. During his career, Storer had made hundreds of arrests of drug traffickers, purchased illegal drugs in the course of undercover operations for various police agencies on many occasions, and, by his own estimate, patted down (or "frisked") more than 1,000 persons suspected of drug offenses.

On November 24, 1998, Storer was working as part of a police team conducting surveillance of various locations in Geneva, New York, where drug activity was suspected. He was sitting in an automobile in a parking lot on the east side of North Main Street, which runs north and south in Geneva. He had selected that location so that he could monitor activities at an apartment building on Castle Street, which intersects North Main Street just north of the parking lot.

Storer was in radio contact with the other officers in the surveillance team, who periodically transmitted descriptions of activities at their various locations. At approximately 5 p.m., Storer overheard the first of a series of radio transmissions describing events on Seneca Street, which intersects North Main Street south of the parking lot where Storer was located. According to the first transmission, an individual, later identified as Casado, had emerged from a station wagon parked on the south side of Seneca Street and entered 118 Seneca Street, an apartment building. The police had recently received information that the building was the site of frequent drug sales, and Storer had

---

1. The Supreme Court in *Terry* discussed investigatory stops in addition to protective searches. The Court has explained these investigatory searches, which have come to be known as "*Terry* stops," as follows:

   Under the Fourth Amendment ... a policeman who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to investigate the circumstances that provoke suspicion. The stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, ... he must then be released.

   *Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (footnotes and quotation marks omitted). Although the district court held that the officer's attempt to question Casado prior to the search of his pocket was justified as a *Terry* stop, we do not reach the issue of whether the stop comported with the Fourth Amendment.

personally purchased drugs and executed search warrants in that building in the past. A subsequent radio transmission indicated that, with Casado still inside 118 Seneca Street, the station wagon driver, later identified as Felix Osso, had pulled the car into the street, turned north onto North Main Street, and stopped just south of Storer's position in the parking lot. Osso then emerged from the station wagon, walked down an alley, and behaved in a manner that suggested to the observing officer that Osso was urinating.

After Storer's radio briefly fell silent, he received another transmission describing events just to the south of his position: After spending approximately fifteen minutes inside the apartment building, Casado had emerged, and was walking in the direction of North Main Street. Upon reaching it, he turned north and rendezvoused with Osso. The transmission further indicated that as the two men continued walking north together along North Main Street, Osso handed Casado something, which Casado placed in the right front pocket of his pants.

Knowing that the two men would soon reach Storer's position, and that four other members of the police surveillance team were no more than a block away, Storer decided to act. His plan was to arrest Osso for urinating in public, and to question Casado regarding potential drug activity at 118 Seneca Street. Storer issued a command over the radio—"We're going to stop them"—and then emerged from his automobile. Hr'g Tr. at 128. As Casado and Osso reached the parking lot, they turned, entered it, and walked toward Storer. Storer, meanwhile, approached them on foot, noticing that Casado had his right hand in the right front pocket of his pants, and had his left hand over that pocket. Storer shouted, "Police, take your hand out of your pocket." *Id.* at 98. Casado did not comply, but instead, according to Storer's testimony, "looked to the left and ... to the right." *Id.* at 99–100. This prompted Storer to draw his gun, point it at Casado, and twice more order him to remove his hand from his pocket. Casado still did not comply. At this point, the other officers in Storer's team were entering the parking lot and approaching Casado and Osso from behind. As these officers took Osso into custody, Storer reholstered his weapon and approached Casado. Storer then seized Casado's right hand, pulled it out and away from his pocket, and kept it in his grip. Without conducting a patdown, Storer then reached with his free hand into the pocket where Casado's hand had been and removed its contents, which included a pager, cash, and crack cocaine in a plastic bag. Storer yelled toward the other officers, "We got dope," upon which Casado exclaimed, "It's all me, it's on me, it's for personal use. It's my personal use." *Id.* at 114, 143. Casado was then arrested.[2]

---

**2.** Six days later, on November 30, 1998, Storer testified at Casado's preliminary hearing in Geneva City Court. In response to the question, "What reaction did you get," referring to his confrontation with Casado, Storer stated:

> [Casado] stopped, looked to the left and to the right as if he were going to run. I once again said, "Take your hand out of your pocket now." He didn't. I went and grabbed ahold of him and *put him in handcuffs and secured him and put my hand into the right front pocket where his hand was.*

(Emphasis added.) At the September 9, 1999, suppression hearing before Magistrate Judge Feldman, Storer testified in conformity with the account set forth in the magistrate judge's report and recommendation outlined in this opinion, above. When Storer was pressed by the defense regarding the apparent discrepancy between his City Court testimony and his testimony before the magistrate judge, the government objected, arguing that nothing in Storer's city court testimony indicates that the chronology of the events conformed to the order in which Storer described them. In

On May 25, 1999, Casado was indicted for, *inter alia*, possessing with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). He pleaded not guilty and moved to suppress the evidence taken from his pocket and his inculpatory statements at the time of his arrest. After conducting an evidentiary hearing on September 9, 1999, the magistrate judge issued a report and recommendation concluding that Casado's motion should be denied. The magistrate judge was of the view that Storer's seizure of Casado was proper because Storer reasonably suspected that Casado was armed, and further that the scope of the search of Casado's pocket was reasonable because of Casado's failure to remove his hand from that pocket in response to Storer's commands.

On February 9, 2000, the district court adopted the magistrate judge's report and recommendation, denied Casado's motion to suppress, and set the case for trial. Casado promptly fled the jurisdiction. A fugitive for ten months, he was apprehended in Philadelphia on February 22, 2001. The government secured a superseding indictment on March 29, 2001, which added to Casado's drug charges one count of disobedience of a lawful order of a United States court in violation of 18 U.S.C. § 401(3).

Casado pleaded guilty to the possession and disobedience counts in his indictment pursuant to a plea agreement. On August 23, 2001, the district court sentenced him principally to sixty-three months in prison for possessing with intent to distribute cocaine base, and nine months for disobeying a lawful court order. In his plea agreement, Casado reserved his right to appeal the denial of his motion to suppress and to withdraw his plea to the drug charge should his appeal succeed. This is that appeal.

## DISCUSSION

The confrontation between Casado and Investigator Storer involved both a "search" and a "seizure" within the meaning of the Fourth Amendment: Casado was seized when Storer grabbed his hand, if not before, and searched when Storer reached into his pocket. Casado now challenges the constitutionality of both. We conclude that the search of Casado's pocket was "unreasonable" under, and was therefore forbidden by, the Fourth Amendment, and thus that the evidence obtained during the course of the search was inadmissible. We do not reach the separate questions regarding the timing and reasonableness of the seizure.

### I. Standard of Review

Although we review *de novo* the legal issues presented by a motion to suppress, we accept the district court's factual findings unless clearly erroneous, and we view those facts in the light most favorable to the government. *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir.1996).

### II. *Terry* Weapons Searches

█ It is well established that warrantless searches and seizures are *per se* unreasonable under the Fourth Amendment unless they fall within one of several recognized exceptions. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One important exception is a search incident to a lawful arrest.

other words, the government argued that even though Storer said "I ... put him in handcuffs and secured him and put my hand in the right front pocket," he did not mean that he put Casado in handcuffs *before* he reached into Casado's pocket. The magistrate judge accepted this explanation, and Casado does not now argue that the magistrate judge's finding in this regard was clearly erroneous.

*See United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). The government does not assert, however, that Storer had probable cause to arrest Casado when Storer reached into Casado's pocket. And the government cannot, of course, assert that the officer's search of the defendant's pocket was justified by what it in fact produced. *See Smith v. Ohio,* 494 U.S. 541, 543, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990) (per curiam) (confirming the axiom that a search cannot be justified as incident to an arrest it preceded). The government argues instead that the reach into the pocket constituted a weapons search for the purpose of ensuring the safety of Storer and his fellow officers, and thus was justified under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In *Terry,* a plainclothes policeman, Martin McFadden, noticed two men repeatedly walking past and peering into a storefront on a street in Cleveland, Ohio. *Id.* at 5–6, 88 S.Ct. 1868. Fearing that the two men were "casing" the store in preparation for an armed robbery, McFadden approached them, identified himself as a police officer, and asked for their names. *Id.* at 6–7, 88 S.Ct. 1868. When the men merely mumbled in response, McFadden grabbed one and "patted down the outside of his clothing." *Id.* at 7, 88 S.Ct. 1868. This frisk revealed a pistol in the left breast pocket of the man's coat, prompting McFadden to remove the coat and retrieve the weapon. *Id.* McFadden then frisked the second man and found another gun. *Id.* A patdown of a third man, who was present but who had not joined his companions in their passes by the storefront, revealed no weapon. *Id.* at 6–7, 88 S.Ct. 1868. The two armed men were then arrested and charged with carrying concealed weapons. *Id.* at 7, 88 S.Ct. 1868.

Affirming a denial of a motion to suppress, the Supreme Court rejected the defendants' argument that the frisk of their clothing and subsequent removal of their guns were justified only if probable cause existed. *Id.* at 24, 88 S.Ct. 1868. Instead, the Court concluded:

> [T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.

*Id.* at 27, 88 S.Ct. 1868. The Court then held that a search must meet two requirements to fall within this "narrowly drawn authority." First, it cannot be motivated solely by a "hunch" that an individual is armed and dangerous. *Id.* There must instead be a suspicion supported by "specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Id.* Second, the weapons search must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* at 29, 88 S.Ct. 1868.

The Supreme Court then concluded that Officer McFadden's search met these requirements. McFadden's suspicion was reasonable in light of the information available to him suggesting that the men he subsequently searched were contemplating an armed robbery. *Id.* at 28, 88 S.Ct. 1868. And the scope of the search was appropriately limited because

> Officer McFadden patted down the outer clothing of [the suspects]. He did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns. He never did invade [the third man's] person beyond the outer surfaces of his clothes, since he discovered nothing in his pat-down which might have been a

weapon. Officer McFadden confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons.

*Id.* at 29–30, 88 S.Ct. 1868.

Although the Court emphasized the difference between a patdown and a search inside a pocket in the course of assessing the reasonableness of McFadden's conduct, it cautioned against drawing broad conclusions based on its analysis of the particular facts of the case. Because "[n]o judicial opinion can comprehend the protean variety of the street encounter," the Court could "only judge the facts of the case before [it]." *Id.* at 15, 88 S.Ct. 1868. "Each case of this sort will, of course, have to be decided on its own facts." *Id.* at 30, 88 S.Ct. 1868.

On the same day it decided *Terry,* the Court also issued its opinion in *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). There, a uniformed New York City police officer had, over an extended period of time, observed an individual named Sibron engaging in repeated conversations in public places with individuals whom the officer knew to be drug addicts. *Id.* at 45, 88 S.Ct. 1889. The officer did not, however, see any items pass between Sibron and the addicts. *Id.* While Sibron was sitting in a restaurant, the officer approached him and asked him to step outside. *Id.* Sibron complied, at which point the officer said, "You know what I am after." *Id.* Both men then simultaneously reached into Sibron's pocket, where the officer seized several glassine envelopes containing heroin. *Id.*

Reversing a decision of the New York Court of Appeals, the Supreme Court held that the heroin was inadmissable as evidence against Sibron. *Id.* at 62, 88 S.Ct. 1889. The Court first ruled that the search of Sibron's pocket could not be justified as incident to a lawful arrest be-

cause "[n]othing resembling probable cause [for his arrest] existed until after the search had turned up the envelopes of heroin." *Id.* at 62–63, 88 S.Ct. 1889. The Court then considered whether the reach into Sibron's pocket constituted a permissible protective weapons search, but rejected this attempted justification as failing to meet either of the requirements identified in *Terry.* "In the case of [a] self-protective search for weapons, [an officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *Id.* at 64, 88 S.Ct. 1889. Such facts, the Court held, plainly were not present. *Id.* More important for our purposes, the Court observed that even if such facts had been present, the search of Sibron's pocket would have been unreasonable in light of its scope:

> Even assuming *arguendo* that there were adequate grounds to search Sibron for weapons, the nature and scope of the search conducted by [the officer] were so clearly unrelated to that justification as to render the heroin inadmissible. The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault. Only when he discovered such objects did the officer in *Terry* place his hands in the pockets of the men he searched. In this case, with no attempt at an initial limited exploration for arms, [the officer] thrust his hand into Sibron's pocket and took from him envelopes of heroin.... The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man.

*Id.* at 65, 88 S.Ct. 1889.

Since *Sibron,* neither the Supreme Court nor we have addressed a case in

which an officer, in the course of a weapons search, reached into a suspect's pocket without first conducting a patdown of "the outer clothing," *Terry,* 392 U.S. at 29, 88 S.Ct. 1868.[3] In *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), however, the Supreme Court again addressed the use of a patdown search in detecting weapons during a *Terry* stop. There, police saw a man leaving an apartment building considered a "notorious 'crackhouse.'" *Id.* at 368, 113 S.Ct. 2130. Upon making eye contact with an officer, the man reversed his direction and walked away, prompting the police to stop him and conduct a frisk. *Id.* at 369, 113 S.Ct. 2130. Upon patting down the man's pocket, an officer ascertained that there was no weapon, but did feel a "small lump." *Id.* As he continued to examine the lump with his fingers, the officer developed a suspicion that it was crack cocaine. *Id.* He then reached into the suspect's pocket, confirming his suspicion. *Id.*

The Supreme Court ruled that the cocaine thus seized was inadmissible against the suspect because the search exceeded its sole possible justification: detecting weapons. *Id.* at 378, 113 S.Ct. 2130. During the frisk of the pocket, a point came at which the officer knew the pocket contained no weapons, but did not yet have probable cause to believe that the suspect possessed drugs. *Id.* at 378–79, 113 S.Ct.

2130. The Court held that continuing the patdown of the pocket beyond that point was unreasonable. *Id.* at 379, 113 S.Ct. 2130. The Court noted, however, that had the officer developed, through his sense of touch or otherwise, probable cause for an arrest before that point, it would have been permissible for the officer to have then seized the contraband. *Id.* at 375–76, 113 S.Ct. 2130. This was true, the Court held, partly because

> *Terry* itself demonstrates that the sense of touch is capable of revealing the nature of an object with sufficient reliability to support a seizure. The very premise of *Terry,* after all, is that officers will be able to detect the presence of weapons through the sense of touch and *Terry* upheld precisely such a seizure.

*Id.* at 376, 113 S.Ct. 2130.

### III. The Law Applied to the Casado Search

In judging the reasonableness of Investigator Storer's actions, we are mindful of the *Terry* Court's observation that because "[s]treet encounters between citizens and police officers are incredibly rich in diversity," *Terry,* 392 U.S. at 13, 88 S.Ct. 1868, our determination of reasonableness must be moored to the "concrete factual circumstances" of the case before us, *id.* at 29, 88 S.Ct. 1868. We are cognizant "of the limitations of the judicial function in control-

---

**3.** In *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Supreme Court held that after a police officer was told by a reliable informant that a suspect was armed, the officer did not act unreasonably in reaching to the suspect's waistband to remove a gun, despite the fact that the officer did not first patdown or frisk the area he suspected contained the weapon. *Id.* at 144–45, 149, 92 S.Ct. 1921. There is no indication, however, whether the officer reached within or under the suspect's clothing to remove the gun. And the suspect was sitting in an automobile, rather than standing out of doors, as had been the suspects in *Terry* and

*Sibron,* prompting Judge Friendly's observation when the case was before this Court that "attempting to 'pat'" down the *car occupant* was "impracticable under the circumstances." *Williams v. Adams,* 436 F.2d 30, 35 (2d Cir.1970) (Friendly, J., dissenting), *rev'd on reconsideration in banc,* 441 F.2d 394 (2d Cir.1971) (per curiam), *rev'd,* 407 U.S. at 149, 92 S.Ct. 1921 (1972). Because of the fact-specific nature of our inquiry, *see Terry,* 392 U.S. at 30, 88 S.Ct. 1868, and the significant difference between the facts in *Adams* and those in the case at bar, *Adams* sheds little light on our inquiry.

ling the myriad daily situations in which policemen and citizens confront each other on the street." *Id.* at 12, 88 S.Ct. 1868. And we heed the Supreme Court's admonition that

> [a] court making [the] assessment [of reasonableness] should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); see also *United States v. Martinez–Fuerte,* 428 U.S. 543, 557 n.12, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*United States v. Sharpe,* 470 U.S. 675, 686–87, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (internal citation omitted; last alteration in original).

We assume without deciding that Storer had a reasonable suspicion that Casado was in a position to "gain immediate control of weapons." *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). We focus our inquiry on the second *Terry* requirement: that a search must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. 1868. And we conclude that Storer's search "was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer [and the backup officers] by disarming a potentially dangerous man." *Sibron,* 392 U.S. at 65, 88 S.Ct. 1889.

Storer confronted Casado and ordered him to remove his hand from his right front pants pocket. For reasons not clear from the record, Casado did not comply, prompting Storer to take other measures. He took Casado's right hand out and away from Casado's pants pocket. There is no indication in the record that once Storer took Casado's hand out of the pocket, Storer could not have patted down the pocket to determine whether his fear of a weapon was justified, "and then ... merely reached for and removed" any weapon had he found one there. *Terry,* 392 U.S. at 30, 88 S.Ct. 1868. Yet Storer took the more intrusive step of reaching inside Casado's pocket and removing everything in it. Storer thus did that which the Supreme Court in *Terry* credited Officer McFadden for not doing: Storer "place[d] his hands in [the suspect's] pocket[ ] ... [before Storer] had felt weapons." *Id.* at 29, 88 S.Ct. 1868. And he did what the Supreme Court in *Sibron* indicated was "not reasonably limited in scope" to "the protection of the officer": "[W]ith no attempt at an initial limited exploration for arms, [the officer] thrust his hand into [the suspect's] pocket and took from him [evidence of a crime]." *Sibron,* 392 U.S. at 65, 88 S.Ct. 1889.

The government argues that the search was reasonable based on Storer's testimony that Casado's failure to remove his hand from his pocket after repeated commands made Storer suspect that Casado "was going to escalate the violence." Gov't Br. at 20 (citing Hr'g Tr. at 102). But this does not distinguish this case from *Terry* and *Sibron* in any significant way. It is simply a statement of the reason why Storer might have feared for life and limb and

therefore *initiated* a *Terry* search. It provides no independent justification for the *scope* of the search he selected. As the Supreme Court observed in *Terry* and reaffirmed in *Dickerson*, a patdown is ordinarily an effective procedure for detecting a weapon even when the person being frisked is reasonably suspected of being armed and dangerous. *See Dickerson*, 508 U.S. at 376, 113 S.Ct. 2130 ("The very premise of *Terry*, after all, is that officers will be able to detect the presence of weapons through the sense of touch. . . ."). The government's proffered justification—Storer's fear of violence—in itself supports no inference that something about Storer's and Casado's positions at the time of the search, or about Casado's clothing, prevented Storer from patting Casado's pocket effectively. Nor does the record indicate that the perceived danger would not admit of the delay required to feel Casado's pocket from the outside before reaching inside it. To the contrary, Casado had made no sudden or violent movements at any point during the encounter. Storer was in control of Casado's right hand, and had support from other officers on the scene.

To be sure, "[t]he question is not simply whether some other alternative [to reaching inside Casado's pocket] was available [to Storer], but whether [he] acted unreasonably in failing to recognize or to pursue it." *Sharpe*, 470 U.S. at 687, 105 S.Ct. 1568. To determine whether the search was reasonable, we therefore must consider whether obvious, commonly employed, and effective alternatives were available

under the circumstances. *See, e.g., United States v. Albarado*, 495 F.2d 799, 808–09 (2d Cir.1974) (holding that a frisk of a person who set off an airport metal detector was unreasonable in part because of the availability of the common practice of asking the person to remove his metal objects and walk through the detector a second time). We are keenly aware that an analysis of the reasonableness of police conduct must allow for an officer's need to make quick decisions with limited information at the risk of injury or death to himself, other law enforcement officers, and bystanders. But that analysis is nonetheless necessarily informed by the options available to the police officer. The less intrusive alternative of a frisk was obvious, commonly employed, and would have been effective to achieve the sole legitimate purpose for conducting such a search—physical safety.

A patdown search of the sort that Storer chose not to employ, moreover, is hardly the type of abstract possibility that arises only in the imagination of "[a] creative judge engaged in *post hoc* evaluation of police conduct." *Sharpe*, 470 U.S. at 686, 105 S.Ct. 1568. To the contrary, the patting of the suspect's outer clothing is precisely the form of search that the Supreme Court identified as reasonable in *Terry* and that Storer used routinely in performing his duties as a law-enforcement officer.

■ We acknowledge once again the infinite variety of situations in which a police officer may confront a suspect whom the officer reasonably fears is armed and dangerous. We do not exclude the possibility that in some circumstances a patdown is not required.[4] And we hesitate before

4. For example, in *Adams*, discussed in footnote 3 above, no such frisk was required. And courts in other situations have allowed weapons searches that take forms other than a patdown, particularly where a weapon might be hidden somewhere close by, but not on the suspect's person, *Long*, 463 U.S. at 1049, 103 S.Ct. 3469 (a reasonable weapons search of a car occupant may extend to the

passenger compartment), or where a patdown is unlikely to be effective, *United States v. Thompson*, 597 F.2d 187, 189, 191 (9th Cir. 1979) (upholding a direct reach into the pocket of an overcoat that was so bulky that patting it would not reveal its contents). The assessment of the reasonableness of each search was made on "the facts of the case

criticizing Storer's choice of the means to protect himself in emergent circumstances on the street from the relative calm and safety of chambers. *See Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). But we are not permitted to leave the choice of alternatives for self-protection entirely to Storer's discretion. *Terry, Sibron,* and their progeny teach that the Fourth Amendment protects Casado against an intrusion into his privacy either by a patdown or by an invasion of his clothing, but that the latter is more serious than the former, and that this difference has constitutional significance. *Accord United States v. Vasquez,* 638 F.2d 507, 521 (2d. Cir.1980) (asserting in dicta that "if a weapon is feared, a 'pat down' may suffice, and make unreasonable an actual search of the individual's pockets," citing *Sibron,* 392 U.S. at 65, 88 S.Ct. 1889).[5] We conclude that, as a matter of law on this record, Storer could have protected his safety and the safety of others by employing the less serious intrusion, a patdown, that the method was obvious and well known to him, and that there is no

valid reason apparent on the record for his not using it. We therefore hold that the failure to use the patdown in these circumstances rendered the search "unreasonable."

Storer's search of Casado's pocket therefore violated the Fourth Amendment, and the fruits of the search, including the contents of the pocket and the defendant's spontaneous statements upon their production, are inadmissible against him.

## CONCLUSION

For the foregoing reasons, we vacate the judgment in part, and remand the case with instructions to the district court to vacate its order denying the motion to suppress and to grant the motion, and for further proceedings consistent with this opinion.

---

before" each court. *Terry,* 392 U.S. at 15, 88 S.Ct. 1868.

**5.** The government points to two cases in which other courts have authorized protective searches that did not involve a patdown. In one, *United States v. Hill,* 545 F.2d 1191, 1192–93 (9th Cir.1976) (per curiam), a police officer, without first conducting a patdown, raised a suspect's shirt after seeing a large bulge at his waistband. In the other, *United States v. Terry,* 718 F.Supp. 1181, 1183 (S.D.N.Y.1989), *aff'd,* 927 F.2d 593 (2d Cir. 1991) (unpublished table opinion), an officer, instead of patting, opened a woman's outer jacket, and then, upon observing a bulge, reached under her sweatshirt to remove a bag. In both cases, the courts held that *"Terry* does not limit a weapons search to a pat down of the outer clothing." *United States v. Terry,* 718 F.Supp. at 1186 (citing, *inter alia, Hill,* 545 F.2d at 1193). As noted, we agree with the general principle that a patdown is not the only type of search authorized by

*Terry,* and that there are circumstances in which a patdown is not required. We observe, however, that neither case cited by the government involved the search of a *pocket.* Moreover, the district court in *United States v. Terry* held that the search in that case was reasonable both because there existed probable cause for arrest and because it found that a patdown would have been less effective, and more intrusive, than the course actually pursued by the police officer. *Id.* at 1187. And while the Ninth Circuit in *Hill* was less clear about its reasoning, we note that the case involved the lifting of a shirt to reveal visually a waistband rather than the perhaps more intrusive exploration of the inside of a suspect's pocket, and the officer visually detected a bulge in the suspect's clothing, suggesting that the relevant information a patdown can provide—the presence of a hard object consistent with a weapon—might already have been available to the officer, rendering a patdown unnecessary. *Hill,* 545 F.2d at 1192.