**UNITED STATES of America**

v.

**Neville THOMAS**

**No. CR. 304CR268MRK.**

United States District Court,
D. Connecticut.

March 7, 2005.

John H. Durham, U.S. Attorney's Office, New Haven, CT, Ronald Scott Apter, Thomas V. Daily, U.S. Attorney's Office, Hartford, CT, for United States of America.

Paul F. Thomas, Federal Public Defender's Office, New Haven, CT, for Neville Thomas.

### MEMORANDUM OF DECISION

KRAVITZ, District Judge.

Defendant Neville Thomas is charged in a one-count indictment [doc. # 1] with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Mr. Thomas now moves to suppress the .380 caliber, semi-automatic pistol that Hartford police found in his waistband on June 13, 2004, when Mr. Thomas was patted down immediately upon exiting the passenger side of a rental van parked in a high-crime area of Hartford at 2:45 a.m. The question presented by the motion to suppress is narrow. Mr. Thomas does not challenge the police officer's authority to order him out of the vehicle. Nor does he contest the scope of the pat down. Rath-

er, Mr. Thomas asserts that the officer who patted him down did so without a reasonable suspicion that he was committing a crime or was armed and dangerous. As a consequence, Mr. Thomas asserts that the officer violated Mr. Thomas' Fourth Amendment rights when he conducted the pat down and discovered the weapon that forms the basis of the charge against Mr. Thomas.

On January 10, 2005 the Court held an evidentiary hearing on Mr. Thomas's Motion to Suppress [doc. # 13]. Hartford Police Officers Dominic Agostino and John Zweibelson testified at the hearing. *See* Witness List [doc. # 21].[1] The Court also received certain documents into evidence. *See* Exhibit List [doc. # 20].[2] Thereafter, the parties submitted post-hearing briefs. *See* Def.'s Br. in Supp. of Mot. to Suppress [doc. # 22]; United States' Resp. to Def.'s Mot. to Suppress Evidence [doc. # 23]. Both attorneys are to be commended for their efficient, professional and effective presentations of their positions. The Court now DENIES Mr. Thomas' Motion to Suppress [doc. # 13] for the reasons set forth below.

## I.

The facts relevant to the Motion to Suppress are not in dispute. In the early morning hours of Sunday, June 13, 2004, at about 2:45 a.m., an unidentified citizen telephoned the Hartford Police Department and reported loud music coming from a blue van parked at 46 Edgewood Street in the North End of Hartford. Tr. at 10; Joint Exhibit 1. Hartford Police Officers Dominic Agostino and John Zweibelson were each separately on patrol in the North End at the time, and they were dispatched to respond to a complaint of "Blu Caravan Blasting Music." Joint Exhibit 3. At the time of the incident, both officers had been members of the Hartford Police for about a year and one-half, and had primarily been assigned to the North End. Tr. at 5, 52–53.

Both officers testified that they were familiar with Edgewood Street based upon their own personal experiences during their tenure with the police department, as well as based upon their training. They also testified that they knew the Edgewood Street area to be a high drug trafficking area, with "a lot of abandoned buildings where people do their narcotic sales," as well as a location known for violent crimes such as a robberies, stabbings and shootings. Tr. at 8–9, 16, 58–59. Officer Agostino described the area as one of "[v]iolent crimes. I've done stabbings and shootings, several shootings in that area. It's a threatened area, heightened security." Tr. at 9. He said that based upon his patrolling of the Edgewood Street area, "usually between 4:00 o'clock in the afternoon until about 6:00 in the morning, there's a high drug trafficking activity, including a lot of street robberies, a lot of narcotic sales, a lot of car breaks." Tr. at 9. Officer Zweibelson, who had responded to many calls on Edgewood Street in the past, testified similarly:

> Edgewood Street is a street off Albany Avenue, which I work. There's a lot of crime, a lot of drug trafficking activity. I've done numerous shootings on Edgewood Street, numerous purse snatchings, stabbings, basically everything since I've been out there . . . [Edgewood

1. The Officers were sequestered during their testimony though they had driven to the hearing from Hartford together. *See* Transcript from January 10, 2005 Hearing ("Tr.") at 20, 68.

2. *See* Joint Exhibit 1 (Officer Agostino's Incident Report); Joint Exhibit 2 (Officer Zweibelson's Incident Report); Joint Exhibit 3 (Dispatch Summary Record).

Street] is one of the top three hot spots [in terms of criminal activity] ... one of the top three hot spots in the north end that I work... I've made numerous narcotics arrests in that area .... there are a lot of abandoned buildings in that area, a lot of drug sales, a lot of open spaces, a lot of abandoned vehicles, a lot of open spaces. Like I said, it's a very hot spot. Tr. at 57–58. Mr. Thomas does not dispute the Officers' characterization of the Edgewood Street area.

Officer Agostino was the first to arrive on the scene, and he was the lead officer; Officer Zweibelson was the backup. Both Officers were in uniform. Officer Agostino pulled his police cruiser directly behind a blue van, which was parked on the wrong side of Edgewood Street—that is, the front of the van was facing in the direction of traffic. Officer Zweibelson arrived shortly thereafter and pulled his cruiser directly behind Officer Agostino's. There were no other vehicles parked in the immediate vicinity of the van and no one on the street or sidewalks. Tr. at 74. Officer Agostino then ran the blue van's license plate on his cruiser computer. The registration came back to PV Holding Corp., which Officer Agostino took to mean that the van was a rental. Tr. at 10–11. There was no indication that the van had been stolen and Officer Agostino did not know who had rented the van. However, he testified that knowing that the van was a rental heightened his concern because in his experience, people often use rental vehicles in others' names to conduct criminal activity. Tr. at 34.

Both Officers got out of their cruisers and approached the van, which had tinted windows, from behind; Officer Agostino on the driver's side and Officer Zweibelson on the passenger side. Neither Officer drew their service revolvers. The engine of the car was running and the driver and pas-senger-side windows were rolled down. Tr. at 35. Both Officers observed two males seated in the front seats of the van, with the seats back and in a reclining position. Loud music was coming from the van, but the Officers did not smell any alcohol or marijuana or see any contraband or weapons inside the van, though with the tinted windows the Officers could not see in the back seat. Tr. at 76.

Officer Agostino asked the driver who he was and what he was doing there. The driver responded in a manner that Officer Agostino described as stuttering, asking Officer Agostino why he was asking these questions. The individual in the driver's seat then provided Officer Agostino with his driver's license, which identified the driver as Larry Anderson, and said that he had just left the house of his girlfriend who lived at 83 Edgewood Street and he was waiting for her. Officer Agostino said that he thought this explanation did not make sense since at the time, the van was parked in front of 46 Edgewood, across the street and about 250–300 feet from 83 Edgewood Street. "[B]ased on my training an experience, I felt that maybe Mr. Anderson and [his girlfriend] were up to some type of criminal activity." Tr. at 16.

Officer Agostino said that he could see an individual (later identified as Neville Thomas) seated in the passenger seat of the van. Officer Agostino described Mr. Thomas as "acting very nervously, suspicious." Tr. at 14. As Officer Agostino put it:

Being such a routine call, a noise complaint, you would think that they would be relaxed, talking and joking with me. I tried to lighten the atmosphere. Hey, what you guys doing? What's going on? How's it going? And I saw Anderson and Thomas both acting suspiciously, looking around, staring, almost like looking for an escape. I observed his rub-

bing his legs, licking his lips. His eyes became wider and wider as I asked more questions.

Tr. at 14, 37. According to Officer Agostino, Mr. Thomas was acting more nervously than Mr. Anderson.

Officer Zweibelson said that he could not hear the conversation between Officer Agostino and Mr. Anderson because of the loud music. Tr. at 75. Officer Zweibelson described what he saw through the passenger window as follows:

> As I made the position where I could observe both the passenger and the operator of the vehicle, I noticed that they seemed to be moving around and in regards to that, we use the term furtive movements which means they were gesturing, Mr. Thomas was licking his lips, he was looking around nervously, his hands were moving around up and down his thighs. The operator, I could also see, was acting strangely in the same manner.

Tr. at 61. Officer Zweibelson did not ask any questions of Mr. Thomas but did tell him to keep his hands out in front. Tr. at 61. Mr. Thomas complied and never sought to reach under the seat, or into the glove compartment or between the seats, although according to Officer Zweibelson, Mr. Thomas continued to be "extremely nervous, moving about, twitching about, his hands were moving." Tr. at 62, 84.

At that point, Officer Agostino asked Mr. Anderson to step out of the car. Officer Agostino explained why he did so as follows: "Well, knowing the area and knowing that I had done several narcotics arrests in that area, with weapons involved, I feared for my safety and the safety of Officer Zweibelson, I asked Mr. Anderson to step out of the vehicle . . . to [c]onduct a cursory search for weapons." Tr. at 16. Asked about his reactions to what he was observing, Officer Zweibelson testified as follows:

> It rose some suspicion . . . In regard to there might quite possibly be drug activity going on, some type of something is going on. Arousing my suspicion through my training and experience and being in the north end of Hartford, based on the fact that the area, the time of night, the information on the rental vehicle, the loud music emanating from the vehicle, all factor[ed] into raising my suspicion.

Tr. at 62–63.

Mr. Anderson then got out of the car and put his hands on the van, as Officer Agostino had requested. Officer Agostino then patted down the outside of Mr. Anderson's clothing, but he did not feel anything unusual. The Officer told Mr. Anderson that he was not under arrest but that he wanted Mr. Anderson to get into the rear of Officer Agostino's cruiser until Mr. Thomas could be checked for weapons. Officer Agostino placed Mr. Anderson in the cruiser and walked back to the van as Mr. Thomas was getting out, as directed by Officer Zweibelson.

Officer Zweibelson conducted a similar pat down of Mr. Thomas, checking for weapons by touching the exterior of Mr. Thomas' clothing while he was facing the van with his hands on the top of the van. Officer Zweibelson described Mr. Thomas as wearing baggy pants and a very baggy shirt with his shirt out of his pants and covering his waistband. In patting down Mr. Thomas, Officer Zweibelson felt a large hard object in Mr. Thomas's waistband. Officer Zweibelson handcuffed Mr. Thomas and then grabbed the object, which he suspected to be a firearm. The object was the .380 caliber, semi-automatic pistol that forms the basis of the federal felon-in-possession charge against Mr. Thomas.

Officer Zweibelson handed the firearm to Officer Agostino to disarm, and Officer Agostino found one round in the pistol's chamber. Tr. at 18. He asked if Mr. Thomas had a permit for the weapon, and when Mr. Thomas said he did not, Officer Agostino placed him under arrest for carrying a pistol without a permit, in violation of Conn. Gen.Stat. § 29–35, and carrying the weapon in a motor vehicle in violation of Conn. Gen.Stat. § 29–36. Tr. at 19. Mr. Thomas was placed in the rear of Officer Zweibelson's cruiser without incident. Mr. Anderson was released from Officer Agostino's cruiser without any charges against him. As Officer Zweibelson was leaving the scene with Mr. Thomas in the police cruiser, Mr. Anderson's girlfriend arrived and was questioned by Officer Agostino. She confirmed that she lived at 83 Edgewood and that Mr. Anderson, her boyfriend, had been visiting her. Tr. at 24.

Officer Zweibelson testified that the reason for his pat down of Mr. Thomas was "officer safety, to make sure that it's a safe questioning environment." Tr. at 94. When asked by the Court to describe the factors that led him to believe he should pat down Mr. Thomas, Officer Zweibelson testified as follows:

> The time of night, the area being Edgewood Street which is a high drug traffic area, a lot of stuff goes on there. It's a rough area of the city … [I]t was a rental van, the windows are tinted. My first priority as an officer is for myself and my partner's safety. As I stated before, I first observed how many parties are in the vehicle. We immediately secured those parties to further investigate, make sure we are safe.

Tr. at 95. In his report, Officer Agostino's described the incident, in pertinent part, as follows:

While questioning Anderson, he and his passenger accused Thomas began to act suspicious. Anderson began stuttering while answering questions and accused Thomas began to make furtive movements in the passenger seat, looking all around, moving back and forth in his seat, acting nervously, and rubbing his hand on his legs. Edgewood St. is a street known for drug trafficking and the related activities surrounding drug activity, including the carrying of dangerous weapons by person or persons in the area. Accused Thomas and Anderson were behaving suspiciously enough for me to be concerned for the safety of Officer Zweibelson who was on the scene to assist me and myself. I had Anderson and accused Thomas exit the vehicle. Once outside of the vehicles we conducted a search for officer safety for weapons. I searched Anderson and Officer Zweibelson searched accused Neville. While patting down the exterior of accused Thomas' clothing, Officer Zweibelson felt a hard object in the shape of a handgun in the front waistband of Accused Thomas. Accused Thomas had in his possession a Browning .380 pistol in his front pant's waistban[d].

Joint Exhibit 1; *see also* Joint Exhibit 2 (Officer Zweibelson's report).

## II.

 Not only is there no dispute about the underlying facts in this case, there is also no dispute about the governing law. Warrantless searches such as that of Mr. Thomas in this case are *per se* unreasonable under the Fourth Amendment unless they fall within one of several recognized exceptions to the warrant requirement. *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *United States v. Casado*, 303 F.3d 440, 443 (2d Cir.2002). "One such

exception was recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which held that 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot ...' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at conforming or dispelling his suspicions." *Dickerson*, 508 U.S. at 372–73, 113 S.Ct. 2130 (quoting *Terry*, 392 U.S. at 30, 88 S.Ct. 1868).

▮ In the circumstances of this case, there is little question that the Officers had authority under *Terry* to conduct a brief investigative stop of Mr. Anderson and Mr. Thomas. They had received a citizen complaint of loud music emanating from what they discovered was a rental van parked in a high crime, and drug trafficking, area in the middle of the night. The van was already stopped when police approached it and the occupants were reclining in their seats, with music blaring. This information provided more than sufficient justification for the Officers to make brief, reasonable inquiries of Mr. Anderson and Mr. Thomas. *See United States v. Briggman*, 931 F.2d 705 (11th Cir.1991) (investigatory stop justified where officer observed defendant's car parked at 4:00 a.m. near commercial buildings in a high crime area). Wisely, Mr. Thomas does not contend otherwise.

▮ It is also undisputed that when police lawfully stop a vehicle, they may require any occupant to exit the vehicle so that the "officer may ask a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (cited in *Cruz v. Miller*, 255 F.3d 77, 83 (2d Cir.2001)). And that is true whether the person ordered out of the car is the driver—as was the case in *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)—or a passenger—as in *Maryland v. Wilson*, 519 U.S. 408, 410, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). As the Second Circuit held in *Mollica v. Volker*, 229 F.3d 366, 369 (2d Cir.2000), "[w]e focus first on the constitutionality of the initial stop because if a stop is lawful, passengers and drivers have no Fourth Amendment interest in not being ordered out of the stopped vehicle." *Id.* at 369. Therefore, there was no Fourth Amendment violation when Officers Agostino and Zweibelson asked Mr. Anderson and Mr. Thomas to step out of the blue van for further questioning.

▮ The critical issue, then, is whether Officer Zweibelson could lawfully pat down Mr. Thomas upon his exiting the vehicle. The answer to that question is determinative of the Motion to Suppress, since it is undisputed that the pat down itself was limited in scope and was not excessive.[3] Here, too, there is much agreement among the parties. Both sides recognize that under *Terry*, " '[w]hen an officer is justified in believing that the individual whose suspicious behavior he is

---

3. "Generally, the permissible constitutional scope of a *Terry* search is limited to a pat-down exploration of a suspect's outer clothing and is exceeded where the officer omits this initial exploration and simply thrusts his hand into the suspect's pocket, or where the outer clothing patdown reveals no weapon and the officer continues the exploration." *United States v. Dailey*, No. 3:02CR340 (JBA), 2003 WL 23100329, at *8 n. 12 (D.Conn. Dec. 30, 2003) (internal citations omitted). *See also Casado*, 303 F.3d at 444 (officer's search was properly limited in scope where he "patted down the outer clothing of [the suspects]" and "did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons").

investigating at close range is armed and presently dangerous to the officer or others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.'" *Dickerson*, 508 U.S. at 373, 113 S.Ct. 2130 (quoting *Terry*, 392 U.S. at 26, 88 S.Ct. 1868); *see Knowles v. Iowa*, 525 U.S. 113, 118, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (officer may "perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous"). "The purpose of this limited search is not to discover evidence of crime but to allow the officer to pursue his investigation without fear of violence...." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

■ Whether the standard for justifying a *Terry* patdown is met depends upon "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger" and in assessing that belief, the court should give "due weight ... to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. "[T]he court must evaluate those circumstances 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir.2000) (quoting *United States v. Oates*, 560 F.2d 45, 61 (2d Cir.1977)). However, the patdown "cannot be motivated solely by a 'hunch' that an individual is armed and dangerous. There must instead by a suspicion supported by 'specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience.'" *Casado*, 303 F.3d at 444 (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868).

## III.

■ Applying the foregoing principles to the facts of this case, the Court concludes that Officer Zweibelson was justified in patting down Mr. Thomas upon his exiting of the van and before initiating any questioning of Mr. Thomas. The Court reaches this conclusion because it believes that under the facts of this case, Officers Agostino and Zweibelson reasonably believed that their safety was in danger and that in those circumstances, ensuring the Officers' safety—through a brief patdown of Mr. Thomas's outer clothing—before continuing with the questioning of Mr. Thomas did not violate his Fourth Amendment rights. *See Wilson*, 519 U.S. at 412, 117 S.Ct. 882 ("reasonableness depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.") (internal quotations omitted).

Here, a number of factors convince the Court that the Officers' had a reasonable concern for their safety. First, it was the middle of the night, and the blue van, about which police had received a citizen complaint, was parked in an area known to the Officers as a location of violent crime, shootings and frequent drug trafficking. Edgewood Street was not even an ordinary high crime area. Instead, it was, as Officer Zweibelson testified without contradiction, one of the top three "hot spots" for crime and violence in the City. As the Seventh Circuit observed in *United States v. Brown*, 273 F.3d 747 (7th Cir.2001), "A nighttime traffic stop, especially in an area where crime is not a stranger is more fraught with potential danger." *Id.* at 748; *see United States v. Garcia*, 279 F.Supp.2d 294, 302 (S.D.N.Y.2003) (officer was "justifiably concerned" about his safety when he conducted a traffic stop in a "high-crime area at night").

Of course, mere presence in a high crime area standing alone, even late at night, would not justify a warrantless police search. *See Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). But that is not the only factor present in this case. *See Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (while "an individual's presence in an area of expected criminal activity" is not alone enough to create reasonable suspicion, it is "among the relevant contextual considerations in a *Terry* analysis"); *Bayless,* 201 F.3d at 134 (recognizing that other facts can make "factors such as the high-crime neighborhood … more significant"). The van had tinted windows, obscuring the Officers' ability to see the interior of the vehicle. Vans with tinted windows pose a special danger to officers conducting a brief investigatory stop. *United States v. Stanfield,* 109 F.3d 976, 981 (4th Cir.1997) (having to approach a vehicle with tinted windows during "already dangerous" traffic stops "increases exponentially" the "potential harm to which the officers are exposed") (cited in *Garcia,* 279 F.Supp.2d at 300). And the van was rented. *See United States v. Murphy,* 261 F.3d 741, 743 (8th Cir.2001) (fact that vehicle was not registered to driver was a factor justifying search). Officer Agostino testified that in his experience rented vehicles are often used in drug trafficking and Officer Zweibelson similarly testified that he found the presence of the rental vehicle suspicious. Tr. at 11, 95.

Again, these facts standing alone would not justify the police in searching the occupants of every window-tinted van or every rented car. However, when police find a rented window-tinted van parked by itself in the middle of the night with its engine running in a "hot area for drug trafficking," it is not unreasonable for police to suspect that a crime, particularly a drug crime, might be afoot. Tr. at 52 ("It looked like they were just waiting for people to purchase [drugs]."). And it is well recognized that firearms are "regularly found on narcotics traffickers." *United States v. Reyes,* 353 F.3d 148, 154 (2d Cir.2003) (firearms are common "tools of the trade" for drug traffickers); *see United States v. Salazar,* 945 F.2d 47, 51 (2d Cir.1991) (it is well known that "narcotics dealers frequently carry weapons").

Importantly as well, both occupants of the van acted nervously and suspiciously, with Mr. Thomas, in particular, rubbing his legs, moving his hands about nervously, looking about as if for a means of escape, looking behind him, and "acting strangely." Tr. at 61; *see Wardlow,* 528 U.S. at 124, 120 S.Ct. 673 ("nervous evasive behavior is a pertinent factor in determining reasonable suspicion"); *United States v. Garcia,* 339 F.3d 116, 119 (2d Cir.2003) (same). Moreover, while Officer Zweibelson did not hear what Officer Agostino and Mr. Anderson were discussing, Officer Agostino was suspicious of Mr. Anderson's explanation that he had been visiting his girlfriend at 83 Edgewood Street, since the van was parked so far from where she lived and on the opposite side of the street.

Of course, there are potentially innocent explanations for all of this. The street may have been full when Mr. Anderson originally parked his car on Edgewood Street and that may have been the closest he could get to his girlfriend's house. The occupants may well have been nervous simply because they had been confronted by two police officers. Also, as Mr. Thomas's counsel points out, a person who is about to commit a crime and is thinking clearly would ordinarily not want to draw attention to himself by blasting music loudly from his van.

The question for the Court, however, is not whether one can conjure up alternative, innocent explanations for everything the Officers saw. Rather, the critical question is whether in the totality of the circumstances, the conclusions the Officers drew from what they observed were objectively reasonable, even if ultimately mistaken. *See Terry*, 392 U.S. at 27, 88 S.Ct. 1868 ("the officer need not be absolutely certain that the individual is armed"); *United States v. Mitchell*, 951 F.2d 1291, 1295 (D.C.Cir.1991) (same). Viewed with a modicum of common sense and through the lens of a trained police officer, the facts presented justified the Officers' concern that Mr. Thomas might be armed and dangerous and that a brief safety patdown of Mr. Thomas's outer clothing was justified before the Officers questioned him further.[4] As *Terry* itself observed, "[c]ertainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23, 88 S.Ct. 1868; *see id.* at 33, 88 S.Ct. 1868 (Harlan, J., concurring) ("There is no reason why an officer, rightfully but forcibly confronting a person suspect of a serious crime, should have to ask one question and take the risk that the answer might be a bullet.").

To be sure, the evidence that Mr. Thomas was "armed and presently dangerous" (in the words of *Terry*, 392 U.S. at 30, 88 S.Ct. 1868) was circumstantial only and (candor requires the Court to note) somewhat thinner than that presented in many of the cases cited by the parties. For example, Officer Zweibelson—who, like Officer Agostino, was not a long-time veteran

of the police force—dutifully describes Mr. Thomas' movements as "furtive." However, Mr. Thomas did not engage in quite the type of "furtive" gestures found in many of the *Terry* stop decisions. Mr. Thomas never tried to reach under his seat, *see United States v. Paulino*, 850 F.2d 93, 97–98 (2d Cir.1988), or into the back seat, *see United States v. Green*, No. 99 CR. 0309(WHP), 1999 WL 1256239, at *3 (S.D.N.Y. Dec. 22, 1999). To the contrary, as Officer Zweibelson testified, at all times Mr. Thomas kept his hands out in front where the Officer could see them through the rolled down window. Also, no one observed a "bulge" in Mr. Thomas's waistband, as occurred in other cases cited by the parties. *See, e.g., Mimms*, 434 U.S. at 112, 98 S.Ct. 330; *United States v. Hamilton*, 978 F.2d 783, 785 (2d Cir.1992); *Garcia*, 279 F.Supp.2d at 300. Finally, the citizen complaint that ultimately dispatched the Officers to Edgewood Street did not involve drugs, guns or even robbery but instead was limited to loud music. And neither Officer smelled alcohol or marijuana or saw any contraband in the van.

Despite these "missing" factors, the Court nonetheless concludes that the factors that did exist in this case were sufficient to justify reasonable and cautious police officers on the scene in believing that their safety was in danger and that the brief safety patdown was required before further questioning. *See `Mitchell*, 951 F.2d at 1296 (pat down was permissible where officer observed defendant making suspicious hand movements while seated in vehicle); *United States v. Jones*, No.

---

4. Mr. Thomas suggests, based upon Officer Zweibelson's testimony, that he would have patted Mr. Thomas down, *regardless of the factors enumerated in the text. See* Def.'s Br. in Supp. of Mot. to Suppress [doc. # 22], at 8. The Court believes that Mr. Thomas misconstrues Officer Zweibelson's testimony. Instead, read in context, his testimony merely confirmed that *having considered all of the factors enumerated above,* it would have been standard practice to pat Mr. Thomas down as a safety precaution before questioning him further. Tr. at 95–96.

3:99CR264 (AHN), 2000 WL 1585256, at *3 (D.Conn. Sept. 5, 2000) ("it was constitutionally permissible for the officers to conduct self-protective pat-down frisks of the Defendants in this case."); *United States v. Baldwin,* No. 3:97CR188 (AHN), 1998 WL 563851, at *3 (D.Conn. June 29, 1998) (affirmed in an unpublished decision). In sum, the Court agrees with the Government that the observations of the Officers in this case provided at least as much suspicion of dangerousness as occurred in *Terry,* where the Supreme Court approved a precautionary safety patdown on the basis of a police officer's reasonable belief that suspects were casing a store for a possible robbery even though the officer never saw a weapon before conducting the safety patdown. *Terry,* 392 U.S. at 7, 88 S.Ct. 1868.[5]

## IV.

The Defendant's Motion to Suppress [doc. # 13] is DENIED.

IT IS SO ORDERED.

---

**5.** Mr. Thomas relies heavily on *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), but that case is distinguishable from the present case. In *Ybarra,* which involved the execution of a search warrant in a public tavern, there was no basis at all for the officers to suspect that *Ybarra* was armed or dangerous or that their safety was at risk. For the reasons stated in the text, that is not the situation presented by this case.